**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas E. SILVERSTEIN, Adolph Reynosa, Clayton A. Fountain, and Edgar Hevle, Defendants-Appellants.**

**Nos. 82–2453, 82–2454, 82–2456 and 82–2457.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1984.

Decided April 26, 1984.

As Amended on Denial of Rehearings and Rehearing En Banc July 26, 1984.

Ellen Robinson, Chicago, Ill., for defendants-appellants.

William J. Linklater, William Lynch Schaller, Baker & McKenzie, Chicago, Ill., for defendant-appellant Edgar Hevle.

Michael B. Nash, Chicago, Ill., for defendant-appellant Clayton A. Fountain.

Patricia C. Bobb, Bobb, Kane, Obbish & Propes, Chicago, Ill., for defendant-appellant Thomas E. Silverstein.

Robert T. Coleman, Asst. U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before PELL and POSNER, Circuit Judges, and PARSONS, Senior District Judge.[*]

POSNER, Circuit Judge.

These appeals by Thomas Silverstein, Clayton Fountain, Edgar Hevle, and Adolph Reynosa from their convictions for complicity in the murder of an inmate at Marion Penitentiary, the nation's maximum-security federal prison, *Garza v. Miller*, 688 F.2d 480, 482 (7th Cir.1982), afford a horrifying glimpse of the sordid and lethal world of modern prison gangs. The story begins with a chance encounter in 1981 of three prisoners—Galez, Perumean, and defendant Silverstein—in a county jail where they were being held en route to various prisons. Galez, who like Silverstein had come from Marion, told Perumean, and Silverstein confirmed, that a black inmate at Marion named Chappelle had "disrespected" Vargas, a member of the prison gang known as the Mexican Mafia. Galez reported that Vargas had planned to kill Chappelle but had given up the idea when guards had discovered and confiscated the knife he had secreted in his cell for this purpose. Silverstein was a member of another prison gang, a gang of white men known as the Aryan Brotherhood, its symbol being the three-leaf shamrock. He was, indeed, a member of the three-man "commission" that governs the Aryan Brotherhood. To qualify for membership in the Aryan Brotherhood you must "make bones." As one prisoner explained, "In effect what it means is you will kill somebody. They distinguish the weed [sic] from the shaft [sic]. You must have a killer instinct. This is to be among an elite and it's not for just any particular white guy." The Aryan Brotherhood and the Mexican Mafia are allied, among other things in their hostility to black inmates, who have their own gangs. (On the contemporary problem of prison gangs see Fox, Organizational and Racial Conflict in Maximum-Security Prisons, chs. 3 and 5 (1982), especially at p. 136; Jacobs, New Perspectives on Prisons and Imprisonment, ch. 3 (1983); Jacobs, Stateville: The Penitentiary in Mass Society, ch. 6 (1977); Porter, *California Prison Gangs: The Price of Control*, Corrections Magazine, Dec. 1982, at 6.)

Later in 1981, two inmates at Marion—David Owens, a member of the Aryan Brotherhood (and the government's principal witness at the trial), and defendant Hevle, a member of the Aryan Brotherhood's commission—were talking, and Owens expressed dissatisfaction with the fact that the Brotherhood had done nothing to avenge the insult to Vargas, a member of an allied gang. Hevle told Owens that the Mexican Mafia should be given time to do

[*] Hon. James B. Parsons, of the Northern District of Illinois, sitting by designation.

something on its own. Soon afterward Perumean and defendant Reynosa (Reynosa a member, Perumean an "associate," of the Mexican Mafia) found themselves confined in another part of Marion—the "Control Unit" (also known as "H-Unit"), where the most refractory inmates are kept. Reynosa, who earlier had told Perumean that he too was upset that the Mexican Mafia had done nothing to avenge Vargas, now (August 1981) told Perumean that he had heard that Chappelle, the "disrespecter" of Vargas, was being moved to the Control Unit. He said "they" were planning to kill Chappelle and that although he did not know what "range" (group of cells) in the Control Unit Chappelle would be on, "they" had people on every range. If Chappelle went to D range, "we" would get him (presumably, the Mexican Mafia—Reynosa and Perumean were in D range). If he went to C range, Tommy Silverstein (now back in Marion, and confined in the C range of the Control Unit) would get him, since Silverstein owed Reynosa a favor.

The Control Unit at Marion has four ranges, A through D, together housing 36 inmates on average. The ranges are locked at each end and each cell has only one occupant, who is let out of his cell once a day for about an hour and ten minutes either to recreate in the range corridor or in the Control Unit's special recreation yard, or to take a shower in the shower room at the end of the range. The inmates of the Control Unit are served their meals in their cells by guards. Although inmates from different ranges are not allowed to mingle, they can occasionally talk or shout to each other. From the Control Unit's recreation yard it is possible to shout through windows at the end of the range corridors and in the Control Unit's law library to inmates recreating in the yard, because the windows give on the yard. Within a range inmates can talk to each other between cells and also while recreating—especially since they are sometimes permitted to recreate in pairs.

A few weeks after their conversation, Owens again asked Hevle what the Aryan Brotherhood intended to do about Chap-

pelle. Hevle replied that Bartosh, another member of the Brotherhood at Marion, was going to be sent with Silverstein to Atlanta ("writted to Atlanta," in prison lingo) to testify in a case and the two would discuss the matter there. During this trip, Bartosh and Silverstein were frequently together, and when they returned, Bartosh told Owens that Silverstein had told him that Chappelle was on Silverstein's range in the Control Unit and that Silverstein would take care of him.

Nine days later, after their evening meal, Silverstein and another inmate of C range, defendant Fountain, an "associate" of the Aryan Brotherhood, were let out of their cells to recreate. They were not kept under continuous observation by guards during the hour in which they were roaming the corridor of C range. An hour and a quarter after Silverstein and Fountain were returned to their cells Chappelle was found dead on the floor of his cell. Medical evidence showed that he had been strangled about an hour after eating, by a cord held by two people as he lay on his bed with his head leaning against the bars of the cell. The next day Reynosa told Perumean, "we finally got the son of a bitch," and later Silverstein told Perumean that he and Fountain had "yoked the nigger." Fountain told another inmate, "I am glad we killed him," and Silverstein told another, "I am just sorry I had to kill him through the bars and couldn't get next to him."

The jury convicted Silverstein and Fountain of murder, and they were sentenced to life imprisonment. The jury convicted Silverstein, Hevle, and Reynosa of conspiracy to murder. Silverstein was sentenced to 20 years in prison, and Hevle and Reynosa to 40 years each, for this crime. All of the sentences were made consecutive to the other sentences that the defendants are serving.

■ The lapse in security that allowed Chappelle to be murdered in his cell cannot be passed over in silence. Because there is no applicable federal death sentence, be-

cause the Control Unit at Marion imposes the most rigorous confinement in the federal prison system, and because many of the inmates confined there are serving long prison terms without prospect of early parole, the deterrent effects of criminal punishment cannot be relied upon to control the crime rate in the Control Unit. It is true that since the regulations governing confinement in a control unit in federal prison do not contemplate that a prisoner will spend his whole term of imprisonment there, see 28 C.F.R. §§ 541.48, 541.49 (the average length of stay in Marion's Control Unit is 15–18 months), and since the commission of an act of violence in prison is a ground for extending a prisoner's stay in the unit, see 28 C.F.R. § 541.41, inmates have some disincentive to violent behavior. That disincentive is reinforced by the fact that a prisoner under federal sentence (except for drug offenses under 21 U.S.C. § 848) is eligible for parole after he has been in prison for a maximum of ten years, no matter how long his sentence is—even if he is serving multiple life sentences—and that any additional convictions will reduce his prospects for parole. See 18 U.S.C. § 4205(a); 28 C.F.R. § 2.36(a). But since parole in the federal system is not mandatory, the effect of an additional conviction on a prisoner's prospects for parole is inherently speculative, and may be slight when the prisoner's prospects for parole are dim anyway because of the gravity of his original crime. Cf. 28 C.F.R. §§ 2.18–2.20. Moreover, Marion takes in state prisoners who may be serving time under sentences that do not allow for parole; there are more than 50 state prisoners at Marion.

All things considered, to many inmates of Marion's Control Unit the price of murder must not be high and to some it must be close to zero. This makes it essential that the prison authorities protect the inmates from each other. They try to do that, of course, and largely succeed. Violence in federal prisons is less, in aggregate terms, than popularly supposed. Seven inmates were killed in federal prisons in 1980 (the latest date for which statistics have been published) out of a total inmate population of almost 25,000, see U.S. Dept. of Justice, Bureau of Judicial Statistics, Sourcebook of Criminal Justice Statistics—1982, at 550 (tab. 6.39), 567 (tab. 6.54). Yet, considering that inmates are supposed to be both disarmed and closely supervised, prison killings *should* be extremely rare. And, while granting as we do that federal court decisions expanding prisoners' rights to challenge both disciplinary measures and the conditions of confinement have made it more difficult than it once was to maintain order in prisons, we nevertheless were distressed to be told by government counsel at the oral argument of these appeals that even though security measures were intensified after the murder of Chappelle, they were soon circumvented and another inmate was murdered in the Control Unit. Both Silverstein and Fountain have been implicated in previous reported cases of prison killings, one under the auspices of the Aryan Brotherhood. See *United States v. Mills*, 704 F.2d 1553, 1555 (11th Cir.1983); *United States v. Fountain*, 642 F.2d 1083, 1085–86 (7th Cir.1981). Another murder of a black inmate by members of the Aryan Brotherhood is recounted in *State v. Farmer*, 126 Ariz. 569, 617 P.2d 521 (1980). What happened in the present case could not have come as much of a surprise to the authorities.

The argument pressed most strongly on this appeal is that the judge improperly excluded the evidence of a key defense witness, Norman Matthews. Matthews had been an inmate in C range on the day of Chappelle's murder, and had been let out to recreate right after Silverstein and Fountain were returned to their cells. When called to the stand to testify he was asked whether he could remember November 22, 1981, and when he answered yes, how he could remember it, to which he replied, "It was the day I killed Chappelle." Though it should not have been unexpected—Matthews had given a statement to the FBI confessing to the murder—his confession in open court caused a commotion. Defense counsel said, "All right, now, Mr. Matthews, you understand this is a court of

law and that you are called here as a witness but you have rights under the Fifth Amendment of the Constitution of the United States not to incriminate yourself. Do you understand that?" Matthews replied, "Yes." At this point the prosecutor objected to the questioning of Matthews. The judge sent the jury out and himself questioned Matthews to make sure he understood and intended to waive his Fifth Amendment right. When the judge finished explaining Matthews' Fifth Amendment right to him, the prosecutor said, "Your Honor, I think Mr. Matthews should also be advised of any potential charges of perjury if in fact he perjures himself on the witness stand." The judge then said to Matthews, "Well, do you understand that, Mr. Matthews? You are under oath and that there would be a possibility that if you would make a misstatement that you could be indicted and tried for perjury?" Matthews replied, "maybe I should take the Fifth.... [Y]ou convinced me I should protect my rights, sir." The judge then ruled that Matthews had a right to remain silent, recalled the jury, and instructed it to disregard the questions that had been put to Matthews and the answers he had given.

■ If before Matthews had answered defense counsel's opening questions the judge, sensing that Matthews might unwittingly incriminate himself, had reminded him of his Fifth Amendment right, there could be no objection, in these appeals anyway, to the judge's action. For that was the holding of *United States v. Colyer*, 571 F.2d 941, 946 (5th Cir.1978), and the defendants do not challenge it. See also *United States v. Morrison*, 535 F.2d 223, 228 (3d Cir.1976). Their argument, rather, is that by blurting out his confession in open court Matthews forfeited his right not to be forced to incriminate himself, so the judge should have required him to continue testifying rather than excuse him. By excusing a defense witness over the defendants' objection without any basis in the Fifth Amendment or any other source of law for doing so, the judge—the argument continues—interfered with the defendants'

right to defend themselves. See *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972).

■ Evaluation of this argument requires us to consider two rules pertaining to the privilege against compulsory self-incrimination. The first is that allowing an incriminating statement to stand as evidence against the person who made it does not violate the privilege even if he was not aware of the privilege when he made the statement—even if, in other words, he was not knowingly waiving a constitutional right. E.g., *Minnesota v. Murphy*, —— U.S. ——, ——, 104 S.Ct. 1136, 1142, 79 L.Ed.2d 409 (1984); *Garner v. United States*, 424 U.S. 648, 654 n. 9, 96 S.Ct. 1178, 1182 n. 9, 47 L.Ed.2d 370 (1976). The reason behind this rule is that if the witness blurted out his confession without prodding, there was no *compulsory* self-incrimination and hence no violation of the Fifth Amendment. See *Garner v. United States, supra*, 424 U.S. at 654–55, 96 S.Ct. at 1182. This rule would be applicable if the government were prosecuting Matthews and seeking to use his confession as evidence against him; but it is not. The rule is not addressed to the question whether a judge, sensing that a witness who is not a party may have blundered into making a self-incriminating statement without appreciating the significance of his action, inflicts a wrong on a party to that case by reminding the witness of his Fifth Amendment right and permitting him to withdraw the statement.

■ The second rule is that if a witness confesses on the stand to wrongdoing he cannot refuse to give the details. See, e.g., *Klein v. Harris*, 667 F.2d 274, 287 (2d Cir.1981). "[T]he privilege [against compulsory self-incrimination] is to suppress the truth, but that does not mean that it is a privilege to garble it ...." *United States v. St. Pierre*, 132 F.2d 837, 840 (2d Cir.1942) (L. Hand, J.), cert. dismissed, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943). But since Matthews' initial testimony was suppressed, his failure to elaborate could

not garble that testimony in any sense relevant to the trial.

■ No court has decided whether the district judge has the power to protect a witness who has begun to incriminate himself from inadvertent abandonment of his Fifth Amendment privilege in circumstances where the government is not seeking either to use the witness's initial testimony against him or to get the witness to elaborate on that testimony in order to prevent distortion. But since in these circumstances the judge can caution a witness before the witness speaks (*Colyer*), and it would be illogical to hold that he may not caution the witness seconds later after the witness has blurted out a damaging admission, we hold that he may.

The manner in which defense counsel questioned Matthews provides an independent reason for refusing to set aside the defendants' convictions because of the exclusion of Matthews' testimony. By asking him whether he realized that he had a constitutional right not to be forced to incriminate himself, counsel invited Matthews to retract his answer and assert his right, and will not be heard to withdraw the invitation. And since Matthews' affirmative answer implied, as defense counsel intended that it should imply, that he was testifying with due awareness of the possible consequences to him of testifying, and therefore presumably with greater reluctance to incriminate himself falsely, the prosecutor was entitled to verify that Matthews really was knowingly waiving his Fifth Amendment right—really was aware that he did not have to testify against himself but that if he did so he could be prosecuted and his testimony used to convict him. If there was any error, therefore, it was invited by defense counsel's manner of questioning Matthews.

■ The judge's questions designed to elicit Matthews' understanding of the significance of his testifying were not excessive in number or badgering in tone or phrasing, and therefore we cannot agree that by the manner of putting them the judge drove a key defense witness off the stand; nor did the *prosecutor* intimidate the witness, as in *United States v. Morrison, supra,* 535 F.2d at 227–28, or *United States v. Smith,* 478 F.2d 976, 979 (D.C.Cir. 1973). And therefore the judge was also justified (indeed compelled) to direct the jury to disregard Matthews' testimony, as the prosecution was deprived by Matthews' assertion of his Fifth Amendment privilege of an opportunity to cross-examine him.

■ The judge's reference to the threat of prosecution for perjury if Matthews testified presents a related issue. The judge said that a misstatement could open Matthews to a perjury prosecution. This was literally true but was likely to create a misleading impression because a critical proviso was omitted: if the misstatement was deliberate. The defendants argue that by exaggerating to Matthews the danger that he might be prosecuted for perjury if he testified on their behalf, the judge improperly drove him from the stand even if the judge's handling of Matthews' Fifth Amendment right was impeccable.

■ In different circumstances we can easily imagine that a judge's telling a defense witness that a misstatement (as distinct from a deliberate misstatement) could result in perjury charges would indeed be reversible error if the witness then declined to testify; it would be an unjustifiable interference with a criminal defendant's right to defend himself by calling witnesses. But it was not fear of perjury charges that led Matthews to step down. When he decided not to testify he gave as his reason his Fifth Amendment right rather than any fear of a perjury prosecution. And it is difficult to imagine that he could really have feared the consequences of such a prosecution. Matthews is serving three consecutive life sentences (at least one a state sentence) for either two or three murders (the record is unclear on this point). The incremental punishment that would result from a conviction for perjury would be, as a practical matter, zero. Thus we cannot believe that the judge's misstatement about misstatements could have been the

decisive factor in Matthews' decision not to testify; if it was error, it was harmless beyond a reasonable doubt.

■ This point may seem to undermine our earlier conclusion that Matthews voluntarily asserted his Fifth Amendment privilege in declining to testify. If he had testified about the murder of Chappelle and his testimony had been believed, he could have been prosecuted for murder but at worst this would have meant another consecutive life sentence—and what would a fourth consecutive life sentence add to the three previous ones? But this is tantamount to an argument that Matthews had no Fifth Amendment right not to testify in the defendants' case because he could not really incriminate himself, an argument that will not wash despite its practical appeal. To incriminate oneself is, as the language of the Fifth Amendment makes clear ("No person ... shall be compelled in any criminal case to be a witness against himself"), to expose oneself to criminal prosecution, *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 872 (7th Cir.1979), even if a successful prosecution is unlikely to add to the punishments that one is already undergoing for other crimes. Matthews' Fifth Amendment right may not have been worth much, which leads us to wonder why he bothered to assert it; but there is no more plausible explanation of why he decided not to testify. The hypothesis that he did so because he feared being prosecuted for perjury if he made an honest mistake is even less believable.

■ But, the defendants argue, if Matthews was allowed not to testify, then at least his pretrial statements, which included a confession to the murder of Chappelle, should have been admitted under the exception to the hearsay rule for statements against interest. See Fed.R.Evid. 804(b)(3). One condition of the exception clearly was satisfied. The declarant was unavailable; Matthews could not be questioned in court about the confession once he took the Fifth Amendment. Fed.R.Evid.

804(a)(1); 4 Weinstein & Berger, Weinstein's Evidence ¶ 804(a)[01] at pp. 804–34 to 804–35 (1981). And we shall assume that the confession was a statement against interest (so satisfying another condition), though the contrary position is arguable since Matthews could not be further punished in view of his life sentences. But there is still another condition in Rule 804(b)(3) that is pertinent to this case: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances *clearly* indicate the trustworthiness of the statement." (Emphasis added.) As this language and the legislative history indicate (see Notes of Advisory Committee on Proposed Rule 803, Subdivision (b), Exception (3); H.R. Rep. No. 650, 93d Cong., 1st Sess. 16 (1973)), such statements are suspect because of a long-standing concern—whether or not well-founded, see 5 Wigmore, Evidence in Trials at Common Law § 1477 (Chadbourn rev. ed. 1974)—that a criminal defendant might get a pal to confess to the crime the defendant was accused of, the pal figuring that the probability of his actually being prosecuted either for the crime or for perjury was slight. See, e.g., *United States v. Tovar*, 687 F.2d 1210, 1213 (8th Cir.1982) (per curiam); *Lyon v. State*, 22 Ga. 399, 401 (1857). The present case provides a good illustration of this concern. Although not shown to be a member of the Aryan Brotherhood or even a sympathizer, Matthews may well be the latter; for he is white, and there was testimony that "almost any solid white man you run into is a sympathizer. I would say the greater majority of the institution." And, as we have said, even if the government prosecuted Matthews either for the murder of Chappelle or for perjury, and succeeded in convicting him, it could not impose significant punishment. Cf. *Chambers v. Mississippi*, 410 U.S. 284, 300 n. 20, 93 S.Ct. 1038, 1048 n. 20, 35 L.Ed.2d 297 (1973).

■ Unfortunately, the precise meaning of the corroboration requirement in Rule 804(b)(3) is uncertain, and is not much

clarified by either legislative history or the cases. See Tague, *Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception*, 69 Georgetown L.J. 851, 958–70, 973–74 (1981). In particular, it is unclear from the rule's language whether the judge may look beyond the evidence offered in corroboration of the statement to evidence either directly contradicting the statement or contradicting the evidence offered to corroborate it. If he may look beyond, the rule is open to the objection that it withdraws the credibility determination from the jury. But probably he may, in light of the Advisory Committee's admonition that "The requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." It is noteworthy that this caution was offered before the House Committee further strengthened the rule by inserting the word "clearly," which had not been in the proposed rule.

Evidence that the judge was not required to ignore created a strong inference that Matthews' statements were totally fabricated—which would be no surprise in view of his de facto immunity from being punished for either murder or perjury. Cf. *United States v. MacDonald*, 688 F.2d 224, 233 (4th Cir.1982). Although the fact that Matthews was let out of his cell before the discovery of Chappelle's body provides slight corroboration for his statements, the medical evidence that Chappelle was killed by two men and the estimate of the time of death entitled the judge to conclude that the circumstances did not clearly indicate that Matthews' confession was trustworthy. Cf. *United States v. Tovar, supra*, 687 F.2d at 1213–14; *United States v. Satterfield*, 572 F.2d 687, 693 (9th Cir.1978); *Lowery v. State*, 401 F.Supp. 604, 607–08 (D.Md.1975), aff'd without opinion, 532 F.2d 750 (4th Cir.1976). But even if the judge should not have considered any evidence beyond that offered to corroborate Matthews' statement, he would have had to exclude the statement. The mere fact that Matthews was out of his cell shortly before

Chappelle's corpse was discovered was not *clearly* corroborative of his confession, but merely consistent with it. It is not as if the statement had contained facts that only the murderer could have known, or if, as in *Donnelly v. United States*, 228 U.S. 243, 272, 33 S.Ct. 449, 459, 57 L.Ed. 820 (1913), which Rule 804(b)(3) overruled, there was other evidence linking Matthews to the crime. In either case the requirement of clear corroboration ("circumstances solidly indicating trustworthiness," *United States v. Barrett*, 539 F.2d 244, 253 (1st Cir.1976)) would have been satisfied, at least if one assumes (as we do not) that the judge could not consider the medical evidence that cast grave doubt on the truth of Matthews' statement. But on the facts presented, the requirement was not satisfied.

■■■■ We reject the argument that Matthews' out-of-court confession (whether or not trustworthy) is further and conclusive evidence that Matthews waived his Fifth Amendment right not to testify at the defendants' trial. The confession was not made under oath; and the Fifth Amendment does not allow the government to force a man to adopt his unsworn out-of-court confession. *United States v. Diecidue*, 603 F.2d 535, 552 (5th Cir.1979).

We turn now to Reynosa's contention that the judge misled the jury by his response to a question that the jury submitted to him while it was deliberating. The question was: "Is it possible to get the testimony of August '81 of Silverstein and Reynosa making contact about murdering Robert Marvin Chappelle?" The judge and counsel conferred about the question. All agreed that there had been no such testimony. The indictment, which had been given to the jury with the usual instruction that it was not evidence, charged that Silverstein and Reynosa made contact in August 1981. But no substantiating evidence had been offered, although the conversation between Reynosa and Perumean in which Reynosa said that Silverstein owed him a favor and would if need be "get" Chappelle did take place in August, and it implied contact, direct or indirect, between

the two. The judge suggested telling the jury, "Sorry, it is not possible to furnish the requested testimony." The defendants' lead counsel agreed, provided the judge added, "Continue with your deliberations." Reynosa's counsel did not demur. The defendants were not present during this exchange and the judge did not reconvene the jury. Instead he sent the following note to the jury: "Sorry, it is not possible to furnish the requested information. Please continue with your deliberations. Judge Foreman."

Reynosa argues that his right to be present throughout the trial was infringed because he was not in the courtroom when the judge replied to the question that the jury had raised, and in addition that the judge's reply prejudiced Reynosa's case by implying that there had been testimony about a conversation between him and Silverstein in August 1981 about murdering Chappelle. Reynosa's counsel did not object either to his client's absence from the courtroom or to the judge's reply to the jury's question; necessarily therefore Reynosa is arguing that these were plain errors. See Fed.R.Crim.P. 52(b).

 Rule 43 of the Federal Rules of Criminal Procedure requires that the defendant be present (if he desires) "at every stage of the trial," and this has been held to include the giving of a supplementary instruction or other communication with the jury after it has begun deliberating. *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975). But the requirement is subject to the doctrine of harmless error. *Id.* at 40, 95 S.Ct. at 2095; *United States v. Burns*, 683 F.2d 1056, 1059 (7th Cir.1982); *United States v. Clavey*, 565 F.2d 111, 119 (1977), modified en banc on other grounds, 578 F.2d 1219 (7th Cir.1978) (per curiam); *Ware v. United States*, 376 F.2d 717, 719 (7th Cir.1967); 3A Wright, Federal Practice and Procedure: Crim.2d § 724 at p. 31 (1982). It is most unlikely that a different reply to the jury's question would have been formulated if the defendants had been present. It was not the sort of question on which counsel would be likely to consult their clients, or on which the clients, if consulted, would be likely to have an answer that would sway the judge. In *Ware,* a similar case, this court described as "fancifully remote" the prospect that the defendant's presence

would have changed the outcome of the trial. 376 F.2d at 718.

 A more troublesome point is that the reply was potentially misleading. It could be understood to imply that the testimony the jury wanted to read had indeed been given but that the transcript had not yet been prepared, or had been mislaid, or the jury for some reason was not entitled to see the transcript. (Another possible interpretation of the note, however, is that no part of the trial transcript—whatever it might contain—was available for the jury to see.) The implication the jury might have drawn—that there had indeed been direct testimony about a contact between Silverstein and Reynosa in August 1981 about killing Chappelle but that the pertinent pages of the transcript were for some reason unavailable—was incorrect. The jury should have been told that there had been no direct testimony about such a contact but that it could consider, if it thought it significant, whether the testimony supported an inference that such a contact had been made.

But we do not think the instruction actually given was so likely to have changed the result that a retrial is necessary to avoid a miscarriage of justice, the test for whether an error is "plain" within the meaning of Rule 52. *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982); *United States v. Blackwell,* 694 F.2d 1325, 1341 (D.C.Cir.1982). It is true that the only evidence of Reynosa's participation in the conspiracy consisted of testimony by other inmates as to incriminating statements that Reynosa had made. But there was a good deal of mutually corroborating testimony along these lines and if the jury believed it, as it was entitled to do, then it had to convict Reynosa, while if it disbelieved the inmates' testimony it had to acquit him. A suspicion (quite possibly correct) that Reynosa and Silverstein had "made contact" (maybe indirectly) in August 1981 could not have tipped the scales. Of course the fact that the jury asked for the transcript shows that the question of such a contact concerned at least one juror, and the form in which the judge replied might have confirmed the erroneous recollection of a juror or jurors who thought there had been such testimony. But since the judge refused to supply the requested transcript, the jury

could not have placed decisive weight on the erroneous recollection of the testimony. Whoever wanted the transcript must in the end have been convinced that there was enough other evidence, as indeed there was, to link Reynosa to the conspiracy to murder Chappelle.

 To be plain, an error must be conspicuous, at least in hindsight, and maybe the error in the supplementary instruction was; but it must also be an error that probably changed the outcome of the trial, and the fact that this error cannot be dismissed as harmless (as can the error in responding to the jury's question without the defendants' being present) is not enough to show that it probably changed the outcome. See *United States v. Blackwell, supra,* 694 F.2d at 1341; 3A Wright, *supra,* § 856 at p. 344. No doubt the difference between the standards of plain and of harmless error is small, but there is some, and there is a reason for it. Reversing a conviction on the basis of an error that the defendant's lawyer failed to bring to the judge's attention is inconsistent with the premises of an adversary system and disruptive of the efficient operation of the criminal justice system. It is justifiable only when the reviewing court is convinced that it is necessary in order to avert an actual miscarriage of justice, which implies the conviction of one who but for the error probably would have been acquitted. We are not convinced that there was such a miscarriage here.

We also reject the argument that acquiescence in the form of the reply demonstrates that Reynosa's trial counsel was ineffective. He made a mistake, but (as we have just said) not a critical one; the representation of none of the defendants at trial fell below the threshold of minimum professional competence.

Although several other issues are raised in the defendants' briefs, none of them has any possible merit. Hevle argues with great vigor that David Owens' testimony was unbelievable, noting that he gave contradictory testimony on some points and pointing out the irony of the government's relying on the testimony of the man who proposed that the Aryan Brotherhood assassinate Chappelle. But Owens' testimony was richly corroborated by that of other inmates. If all inmate testimony were deemed inherently incredible, few crimes within prison walls could be prosecuted—or for that matter defended.

The judgments of conviction are

AFFIRMED.

## ON PETITIONS FOR REHEARING

Reynosa argues that we have changed our test for plain error. We have not. Our formulation is the equivalent of that in the cases *Reynosa* cites, notably *United States v. Jackson,* 569 F.2d 1003, 1010 (7th Cir.1978), where this court said that it must "determine whether the instructional mistake had a probable impact on the jury's finding that the defendant was guilty," and concluded that it was "very unlikely" that it had. The same is true here; for the reasons stated in our opinion we are convinced that it is very unlikely that Reynosa would have been acquitted even if the district judge had not given the confusing instruction.