**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John W. WOLF, Defendant-Appellant.**

**No. 85–1218.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1985.

Decided March 31, 1986.

Rehearing Denied June 6, 1986.

Ann C. Tighe, Cotsirilos & Crowley, Ltd., Chicago, for defendant-appellant.

Paula E. Lopossa, Asst. U.S. Atty., John Daniel Tinder, Indianapolis, for plaintiff-appellee.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

A jury convicted John Wolf of two counts of violating the Mann Act, 18 U.S.C. § 2421, which so far as relevant here makes it a crime knowingly to transport in interstate commerce "any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice." The judge sentenced Wolf to two years in prison to be followed by three years' probation, and fined him $3,000, and he appeals, complaining about the judge's instructions to the jury, the prosecutor's cross-examination of him, and the effectiveness of his trial counsel.

The jury could have found the following facts against Wolf. In 1980 the church in New Albany, Indiana to which Wolf's wife and daughter belonged decided to sponsor a refugee family from Southeast Asia. Wolf, who was 67 years old at the time, installed the family in an apartment above his auto-parts business, but in 1981 the family moved out. Between then and 1984 Wolf made a dozen trips to Bangkok, on one of which his translator was a young woman named Wongsaprome with whom Wolf became smitten. Wolf persuaded her to move from Texas to New Albany and live in the apartment above his business. Once she was there he fondled her in a lecherous manner on one occasion and badgered her incessantly to have sexual intercourse with him, but she refused and eventually moved out of the apartment. Wolf's relationship with Miss Wongsaprome was the basis of Count I of the indictment but the jury hung on this count.

Shortly after she left, Wolf induced a young Cambodian refugee, Chenda Or, to come live in the apartment, by promising to help get her sister (who was languishing in a refugee camp in Thailand) admitted to the United States. Before inviting her to come to New Albany he asked her about her attitude toward sex and whether she had any boyfriends, and tried to embrace her, but his attempt was rebuffed. Miss Or was living in Oklahoma City at the time. She flew to Louisville, Kentucky on a ticket Wolf had given her, and when she arrived he drove her from the airport across the Ohio River to New Albany. He assured her that he would support her. One night she woke up and there was Wolf beside her in the bed, nude, with a leg and arm over her body. Wolf had given her pills which he said were for her tuberculosis but which made her fall asleep, and while she was asleep he entered her locked apartment with his key and took off her clothes as well as his own. She persuaded him to

---

* Hon. William J. Campbell, of the Northern District of Illinois, sitting by designation.

leave, however, and then tried to kill herself by drinking a bottle of alcohol. A few days later Wolf took her to a mental health center where he was seen rubbing her body until a social worker told him to stop. When Miss Or was discharged from the center he had sexual intercourse with her after brandishing a gun and telling her to take off her clothes. For two weeks they had intercourse every night. Wolf then went off on one of his trips to Thailand and Miss Or left the apartment and eventually went back to Oklahoma. Wolf's relationship with Miss Or was the subject of Count II, on which he was convicted.

Within two months of her departure Wolf had installed in the apartment a Laotian refugee family of five, the Viravongs, whom he had brought from Louisville. Several months after they arrived Wolf began hugging and kissing Mrs. Viravong and asking her to make love to him. Although she refused, he was able to fondle her breasts and put his fingers into her vagina, and he also made her fondle his genitals. Eventually the Viravongs moved out of the apartment. Wolf's relationship with Mrs. Viravong was the subject of Count III, on which he was also convicted.

There is no doubt that Wolf made repeated and improper sexual advances to young oriental women whom he had brought to New Albany. Even if there were some exaggerations in Miss Or's testimony, it is plain that Wolf exploited the vulnerable status of these refugees for immoral ends and that—not to put too fine a point on it—he is a disgusting person. But even disgusting people are entitled to appellate review of their convictions. This observation is especially pertinent because the Mann Act is not of course a general regulation of sexual immorality. The primary responsibility for policing sexual misconduct lies with the states rather than the federal government. The Mann Act is merely a prohibition against transporting women across state lines for immoral purposes. The immorality must motivate the transportation. If it does not, the defendant's immoral conduct is a matter of state

rather than federal concern. This point is relevant here in light of Wolf's testimony that he had a sincere desire to resettle Southeast Asian refugees in the United States and that it was this desire which motivated him to bring them to New Albany.

Of course the jury did not have to believe this testimony; Wolf does not and could not argue that a properly instructed jury could not have inferred from the evidence recited above that he brought these women to New Albany for immoral purposes. But in the qualification, "properly instructed," we encounter a serious problem with the conduct of the trial. For on the issue of Wolf's purpose in bringing the women to New Albany the judge instructed the jury only that it must find that Wolf had "at the time of such transportation, ... knowingly intended to cause the said female to engage in one or more acts of immoral sexual conduct as described in such counts" and that "the necessary intent must exist at the time of transportation." This permitted the jury to convict Wolf if it found that he was harboring immoral designs when he took the women across state lines, even if those designs played no causal role in the transportation; and this, he argues, is plain error. (He must argue plain error because no objection was made to the instruction. See Fed. R.Crim.P. 52(b).) We agree. The Act itself says that the transportation must be undertaken with the purpose of engaging in immoral activity. An incidental intention to engage in such activity at the conclusion of a journey is not enough to violate the Act; the immoral purpose must play a role in causing the woman to be transported rather than just be an opportunity created by transporting her entirely for other reasons (e.g., to provide a home for a refugee), even if the opportunity was foreseen. *United States v. Hon,* 306 F.2d 52, 55 (7th Cir.1962); *United States v. Harris,* 480 F.2d 601, 602 (6th Cir.1973). The judge failed to inform the jury of the difference between an incidental intent and (as the cases often say) a dominant or

compelling or efficient cause (in the Aristotelian sense whereby A's shoving B is the efficient cause of B's falling). See, e.g., *United States v. Snow*, 507 F.2d 22 (7th Cir.1974). The courts have approved an instruction that allows the jury to convict if the immoral purpose "was one of the dominant purposes of" the interstate trip. See, e.g., *United States v. Lomas*, 440 F.2d 335, 338 (7th Cir.1971); *United States v. Drury*, 582 F.2d 1181, 1185 (8th Cir.1978). No such instruction was given here.

■ Plain error connotes not only clear error but also prejudicial error—error likely to have changed the outcome of the trial. *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984). By this standard the error in the instructions was plain as to Count III (the Viravong count). If the jury had been instructed properly, Wolf might well have been able to persuade it to acquit him on this count, by arguing that his immoral designs on Mrs. Viravong, if any, would not have sufficed to induce him to transport her entire family to New Albany. She was married, making her a less plausible target, and it was months after she and her family arrived in New Albany that Wolf first made advances to her. He apparently had not molested the woman of the first family to live in the apartment, and there was evidence that his interest in settling Southeast Asian refugees in the United States was not entirely phoney, though strongly colored by lust. This is not a case like *United States v. Dimsdale*, 410 F.2d 358, 362–63 (5th Cir. 1969), where the only purpose of the trip was immoral, so that it was immaterial that the jury had been allowed to convict if "prostitution was one of the purposes of such interstate travel," rather than one of the dominant purposes—or as we might prefer to say, one of the motivating purposes—as distinct from an intention too weak to have caused him to transport the women. In the present case the jury was not even told that it had to find that immoral activity was a purpose of the transportation; it was enough if an intent to engage in it was present when the trips were made, even if that intent played no part at all in causing Wolf to make them.

■ We do not think the error in instructions was plain as to Count II, for there was little evidence of Wolf's having mixed motives as to Miss Or; and reversing Wolf's conviction on Count III would only require resentencing on Count II, on which Wolf was also convicted, rather than a new trial, *United States v. Shively*, 715 F.2d 260, 269 (7th Cir.1983). We must therefore go on and discuss the other alleged errors, beginning with Wolf's cross-examination, to see whether there is also reversible error as to Count II. The issue again is plain error because defense counsel failed to object.

After the prosecutor asked Wolf whether he had ever had sex in Thailand, and he said no, she asked him, "When you returned [to Thailand] in October, 1983, did you not get gonorrhea?" He said no, and the matter was not pursued. The government had evidence, consisting of Wolf's medical records, that he had contracted gonorrhea in 1983. The judge excluded that evidence, even though Wolf's counsel did not object to its introduction (more later in this opinion on the passivity of defense counsel). But no one knows where or from whom Wolf contracted gonorrhea.

■ The question was improper. Although Wolf's sexual activities with oriental women were relevant, no one knows the circumstances in which he contracted gonorrhea, and he contracted it a year after his alleged violations of the Mann Act. The innuendo that Wolf had a venereal disease was calculated to demean him in the eyes of the jury—and there is little doubt that that was the purpose for which it was planted.

■ In cross-examining Wolf about his efforts to bring another refugee family to the United States, which ended with the family's going to Canada instead, the prosecutor asked Wolf whether the reason why the family had not been allowed to come to the United States was that "the American Embassy did not consider you to be an

appropriate sponsor?" There was no basis in the record for this question (which Wolf answered no). Again the purpose was to diminish Wolf in the eyes of the jury.

█ Protracted cross-examination followed about Wolf's relationship with a 14-year-old Thai girl whom Wolf had brought into his home, where she had slept in the same bed with Wolf and his wife (according to Thai custom, Wolf testified). The cross-examination was intended to suggest indecent behavior toward the girl. In the course of this examination the prosecutor asked Wolf, "Did you pay her parents for her?" Wolf answered no and there is no evidence that he bought her, as the question suggested. He had given money to the girl's mother for medical treatment but there is no evidence that the girl was taken in exchange. The entire line of cross-examination was improper; the prosecutor was insinuating Wolf's guilt of another crime, which the government should have been but was not prepared to prove by clear and convincing evidence if it wanted to inject it into the case. *United States v. Wormick*, 709 F.2d 454, 459 (7th Cir.1983).

█ Then the prosecutor tried to get Wolf to admit that he had recommended that Mrs. Viravong have an abortion. Since both Mrs. Viravong and Wolf had denied that she had had intercourse with Wolf and there was no probative evidence that she had, this line of questions had no business in the case, as well as being inflammatory. The government's brief discreetly omits mention of this part of the cross-examination. But at argument the government's counsel (who had been the prosecutor in the district court) told us that "courts must have faith in prosecutors."

Although the improprieties of the cross-examination are clear, it is a separate question whether they were prejudicial with respect to Count II. But we think they were. It is true that if Miss Or was believed, the evidence against Wolf was overwhelming. But she had a history of serious physical and mental illness, and some of her testimony, in particular that Wolf had had sexual intercourse with her every night for two consecutive weeks, was sufficiently improbable to raise doubts about her credibility. This in turn made Wolf's own credibility critical. If the jury had believed his testimony it would have had to acquit him. It might have done so but for the improper destruction of his credibility by the prosecutor.

█ Any doubt about the prejudicial effect of the improper cross-examination is erased when we consider Wolf's last challenge to his conviction, which is that his trial counsel was totally incompetent. Counsel made no objection to any of the improper cross-examination. The government argues that this was a tactical decision: a tactic of no objections. It is true that lawyers will frequently not object to objectionable questions, believing either that the witness will give an answer helpful to the defense (or at least not harmful to it) or that too-frequent objecting will irritate the jury or make it think the defendant is trying to hide the truth. But to have a *policy* of never objecting to improper questions is forensic suicide. It shifts the main responsibility for the defense from defense counsel to the judge. It would make no sense in a case like this where the prosecutor was intent on bringing in extraneous and at times unfounded charges in order to blacken the defendant's character. The failure to object to any of the improper cross-examination discussed above is incomprehensible, as is the failure to object to the instruction on intent or to offer a "dominant purpose" instruction.

But there is more. On direct examination of Mr. Viravong, this colloquy occurred without objection from defense counsel:

Q. Do you think Mr. Wolf did more to your wife than kissing her?

A. Yes, I think because my wife told me that he asked her to.

THE COURT. Just a minute. Are we going to let this hearsay go in? Just cut it off right there.

Q. Besides what your wife said, what makes you think Mr. Wolf did more than kiss your wife?

A. Yes. As I think, but my wife never admit to him [me?] that she never made love with John Wolf, but I think that would be possible.

This was, so far as appears, pure speculation and defense counsel should have objected. It is true that lawyers rightly mistrust instructions that tell juries to disregard what they have just heard; our memories are independent of our wills. But counsel could and should have objected to the question ("what makes you think Mr. Wolf did more than kiss your wife?") before it was answered; this would have forced the government to explain why it thought Mr. Viravong could give admissible testimony on the point. As the government had no basis for thinking he could, the objection would have been sustained and the question never answered. Defense counsel seems to have been paying no attention to the trial. The answer that Mr. Viravong was allowed to give took on added significance because in her opening statement the prosecutor had said that the evidence would show that "on one occasion, he [Wolf] put his penis in her [Mrs. Viravong's] vagina." No such evidence was ever presented other than Mr. Viravong's reply to the prosecutor's improper question, though apparently Mrs. Viravong had told the government before trial that she would testify to having had intercourse with Wolf.

Other instances of ineffective representation include a remarkably inept attempt to impeach the testimony of Mrs. Viravong by calling as a witness the FBI agent who had taken a statement from her and asking him whether her testimony in court was consistent with the statement. The prosecutor objected before the agent could answer, pointing out that before defense counsel could impeach Mrs. Viravong's testimony with her out-of-court statement he must ask her whether she had made the statement. The judge sustained the objection, defense counsel said, "Pardon?," the judge

repeated, "Sustain the objection," and the matter was dropped.

■ There were other instances of ineffective assistance of counsel, but why go on? It is apparent that the handling of Wolf's defense fell "outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). See *Lyons v. McCotter*, 770 F.2d 529, 533–35 (5th Cir.1985); *United States v. Tucker*, 716 F.2d 576, 585–86 (9th Cir. 1983); *Riley v. Wyrick*, 712 F.2d 382, 385 (8th Cir.1983). Even so, Wolf's conviction cannot be set aside on this ground unless "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington, supra*, 466 U.S. at 695, 104 S.Ct. at 2069. But given the doubts that the jury might have had concerning Miss Or's testimony (Count II), and the weakness of the evidence that Wolf brought the Viravongs to New Albany for the purpose of making sexual advances to Mrs. Viravong (Count III), this exacting standard is satisfied here. When the ineffectiveness of defense counsel is added to the errors in the cross-examination and in the instruction, it is apparent that Wolf was denied a fair trial and that his conviction on both counts must be reversed and the case remanded for a new trial.

And since there must be a new trial, we shall advert briefly to another issue. The immoral purposes that the indictment charges Wolf with harboring in transporting these women across state lines were adultery and concubinage, the latter defined in the instructions to the jury as living together outside of marriage. Although the Supreme Court held in *Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), that the immoral purposes to which the Mann Act refers include that of making a woman your mistress, the case was decided almost seventy years ago. The Court reaffirmed *Caminetti* in *Cleveland v. United States*, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946), but for the proposition that the Mann Act

is not limited to commercial sex; the "immoral purpose" in *Cleveland* was polygamy, and it continues to be regarded as immoral by our society. The most recent case that we have found where a conviction for violating the Mann Act was affirmed for transporting a woman merely for the purpose of extramarital sex—a case, as it happens, decided by this court—is thirty years old, *United States v. Mathison*, 239 F.2d 358, 361 (7th Cir.1956), and so far as appears the question whether such a purpose is enough under the statute was not raised. *Whitt v. United States*, 261 F.2d 907, 909 (6th Cir.1959), has overtones of bigamy, and *Reamer v. United States*, 318 F.2d 43, 47–48 (8th Cir.1963), of rape. *Brown v. United States*, 237 F.2d 281 (8th Cir.1956), relied on in *Reamer*, was also a rape case. This country's sexual mores have changed in the last thirty years and it may be questioned whether today a purpose to engage in adultery or fornication, when these acts are committed without aggravating circumstances, such as force, misrepresentation, or taking advantage of a minor, is immoral within the meaning of the Mann Act (assuming it was not the intention of the framers of the Act to freeze the meaning of "immoral" as of 1910, when the Act was passed). See *United States v. McClung*, 187 F.Supp. 254 (E.D.La.1960). We left the question open in *United States v. Mitchell*, 778 F.2d 1271, 1275 (7th Cir.1985); we leave it open today.

None of this is meant to suggest that Wolf is not guilty of violating the Mann Act. Wolf's conduct was not merely adulterous but also coercive and deceptive—as well as exploitive of the vulnerable circumstances of these refugee women, one of whom (Miss Or) was physically and emotionally unwell. Such conduct shows immoral purpose. Cf. *id.* at 1275. But to violate the Act, Wolf's purpose to coerce or deceive or exploit or otherwise victimize the women would have to be a cause of his transporting them across states lines, although it would not have to be fulfilled; it

is the transporting with an immoral purpose, not the consummation of the purpose, that the Act punishes.

REVERSED AND REMANDED.

WILLIAM J. CAMPBELL, Senior District Judge, dissenting.

With all due respect, I must dissent. I believe a reasonable jury could have rationally reached the conclusions it did. I am disturbed by the way the majority subtly second-guesses the jury's conclusions. Finally, I believe the alleged errors in law committed at trial were harmless beyond a reasonable doubt.

The record is riveted with evidence which substantiates the jury's verdict. What the jury found, with the added advantage of weighing and observing the credibility and demeanor of the key characters in question, was that defendant Wolf spent an extraordinary amount of time and effort coaxing young Oriental women into his life with a dominant purpose being to engage in sexual activity with them. The majority writes in a style that sanitizes Wolf's behavior. The impression left is that Wolf quite conceivably could have been trying to help these young, naive Oriental women. The majority emerges with the impression that the evidence is weak as to Wolf's purpose being immoral and that the jury could have reached a different conclusion if a few things were conducted "properly" at trial. This is incredible to me.

Wolf was no guardian angel for the Cambodian/Hmong culture who simply went astray. The jury found he engaged himself in an incredible scheme to defraud and successfully coaxed young Oriental women to come live near him.[1] These young and helpless Oriental women were easy prey for the 67 year-old Wolf. They needed help. Wolf was recommended to them by another Cambodian female, Radina Seng, and Wolf appeared sincere from afar. However, his ultimate intentions were always unveiled and often it did not take long. I have no problem decifering what

1. Of course, there is no evidence Wolf ever attempted to help a young Hmong male.

Wolf's dominant purpose was when he flew to Oklahoma City to meet Chenda Or, a woman young enough to be his grand-daughter. His first encounter with her was at his hotel room at the airport. He asked her totally irrelevant and inappropriate questions such as "Do you know about husbands and wives sleeping together?" Then Wolf asked her to skip work and "stay with him." Later that same day Wolf tried to embrace her. What was Wolf's purpose here? Am I to believe this was a legitimate interview technique?

After this airport episode Wolf coaxed Ms. Or to move to Indiana. Wolf drugged Ms. Or in order to have sex with her and then, that not having worked, forced Ms. Or to have sex with him at gunpoint. It also appears Wolf forced Or to have intercourse with him every night for two weeks thereafter. The majority has little problem placing itself in the position of factfinder in order to doubt the jury's finding it was physically possible for defendant Wolf, a 67 year-old man, to maintain an erection every night for a two-week period. Yet the majority's "scholarly factual findings" in this area are unsubstantiated and in need of expert certification. I see no cite from Masters & Johnson, Dr. David Reuben, Dr. Ruth Westheimer, or another authority in support of the majority's improper self-impeachment of Ms. Or's testimony; testimony the jury believed.

If one weighs the remainder of the record, the evidence does not support Mr. Wolf's or the majority's assertions. The jury verdict appears more than reasonable and based on "easy listening," juicy facts. Mr. Wolf is seen lewdly caressing one of the women in a public mental health center by neutral witnesses and molesting another woman who is married. Several times he forces himself upon different women, forcibly removes their clothing and fondles their genitals against their will. He forces them to fondle his genitals as well. The idea of drugging the women, breaking into their apartment a few hours later and shredding their clothing—this is not beyond our defendant.

As for Wolf's attempt to adapt these women to an American life-style, the evidence reveals Wolf strategically told the youngsters not to leave their apartment (except for school) or talk to or see anyone without his permission. Of course, there is no evidence or mention of Wolf seeking out role models or community organizations for these women to attach themselves to. Can one imagine any of these young women developing an acceptable pattern of social dating with men their own age while living under the jurisdiction of Mr. Wolf? Of course not. In sum, the evidence is overwhelming and, in my opinion, sickening.[2]

Mr. Wolf's "alternative life-style" appears accepted by the majority. We are told it is quite conceivable Wolf didn't expect any of the above to happen when he started out. That was not a dominant purpose of his. Despite similar stories from similar women, the majority believes it is quite possible Wolf meant well but had unanticipated, irresistible impulses. Only after the women crossed state lines did Wolf go berserk, unbeknownst to anyone.

"... a jury verdict must be sustained if, taking the view most favorable to the government, there is substantial evidence to support it ... Thus, only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn a verdict." *U.S. v. Hyman*, 741 F.2d 906, 908 (7th Cir.1984) citing *Glasser v. U.S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Under this long-standing authori-

---

**2.** The majority infers the evidence against Wolf transporting the married Viravong over state lines with the requisite intent is weak because the attempted seduction did not occur until months after the transportation. Yet considering Ms. Viravong was living with a husband and three children, seduction could not be that easy. Further, why hurry? Where were the Viravongs going anyway? Ultimately, the issue for us is: Was the inference the jury drew unreasonable beyond doubt? I have no problem here that it was not.

ty [3] we have no business debating the jury verdict in this case and I am stunned at the ease in which the majority places itself into the position of factfinder in order to raise its own inferences from the testimony.

I now turn to the errors of law that supposedly require reversal in this case. The issue is whether the sexual seduction of Oriental women was merely one dominant purpose behind Wolf's actions. That is all that's required to find a violation under the Mann Act. In *United States v. Snow*, 507 F.2d 22 (7th Cir.1974) Judge (now Justice) Stevens, writing for a panel comprised of himself, Judge Tone and myself, stated:

> [W]e pause to explain our understanding of the government's burden of proof on the intent issue in a Mann Act case.
>
> The government must prove that an intention to have females engage in immoral conduct is a dominant purpose for the interstate trip. As it is often stated, the dominant purpose test is somewhat ambiguous, both with respect to the precise purpose which is relevant and also with respect to how important the illegal purpose must be when additional motives are present. It now appears settled that prostitution or other immoral conduct, need not be the sole reason for the transportation; the Act may be violated if prostitution is *a dominant* or a compelling and efficient purpose. Despite the contrary implication suggested by the word "dominant," *it need not be the most important of defendant's reasons* when multiple purposes are present. (Emphasis supplied.)

In reaching this conclusion in *Snow* we hardly deviated from legal precedent. *Snow* follows the 1971 Seventh Circuit case, *U.S. v. Kotakes*, 440 F.2d 342 (7th Cir.1971). I see no other law changing the "a dominant purpose" test enunciated in *Snow*. Other circuits follow the test as well. (See *U.S. v. Drury*, 582 F.2d 1181,

1185 (8th Cir.1978)). The majority pays lipservice to this test yet then gets involved in a hair-splitting analysis that causes it to lose its perspective as to what we stated was necessary for conviction here under the Mann Act.

The majority claims the trial court committed plain error in instructing the jury it must find Wolf had "at the time of such transportation, ... knowingly intended to cause the said female to engage in one or more acts of immoral sexual conduct ... the necessary intent must exist at the time of transportation." The majority claims this instruction was plain error because it allowed the jury to convict Wolf merely if he was harboring immoral designs, even if those designs played no causal role in the transportation. This is simply untrue. The instruction clearly requires a mens rea and actus reus (using forms of the words intent, act and cause). The instruction verbiage does not mandate a conviction if Wolf's immoral design had *no* causal role in the transportation as the majority suggests. The majority also claims "the jury was not even told that it had to find that immoral activity was a purpose of the transportation." The instruction verbiage clearly does not suggest that. Finally, as a practical matter, I do not believe the jury in this case convicted the defendant due to an "incidental" intention to engage in immoral activity. The idea that the jury could have found differently on the facts of this case if instructed as the majority suggests rests on farfetched speculation. I believe the jury convicted Wolf because it saw evidence Wolf tried to seduce one of the women on their first encounter in a strange hotel in a strange city (*before* he coaxed her to cross state lines), forced a woman at gunpoint to have sex with him, drugged the same woman to have sex with him, molested a married woman, she being the latest in a long line of molestations, etc., etc. The instruction is not a model of perfection, but

---

**3.** *U.S. v. Thomas*, 768 F.2d 611, 614 (5th Cir. 1985); *U.S. v. Tuchow*, 768 F.2d 855, 870 (7th Cir.1985); *U.S. v. Davis*, 767 F.2d 1025, 1040 (2nd Cir.1985); *Glasser v. U.S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680; *Burks v. U.S.*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1; *U.S. v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

I do not believe if the jury had been instructed "properly" as the majority vaguely puts it (I assume they mean using the verbiage "a dominant purpose") the outcome as to any of the courts would be different.[4] In this case I believe any error in the instruction was harmless beyond a reasonable doubt. Indeed, the majority's assertion this instruction constitutes plain error (defense counsel failed to object at trial) sets dangerous precedent.

As for the other alleged errors at trial, none require reversal of the verdict under the circumstances of this case. I do not believe the several inappropriate questions asked by the prosecution and seized upon by the majority had the cumulative effect of demeaning Wolf to such an extent they prejudiced the outcome of the trial. Again, I believe the abundant evidence, not these isolated questions, convicted Wolf. The majority objects to the prosecution's question "When you returned (to Thailand) in October 1983, did you not get gonorrhea?" because it unfairly demeaned Wolf. Yet, Wolf's sexual activities during this time period were relevant; his conduct with the Oriental women who testified at trial was documented as having ended in October of 1983, when the Viravongs moved out of his New Albany apartment. The question was probative as to how Wolf spent his time during this time period in general and not completely unrelated to his intentions during the past year (i.e., maybe Wolf was thinking of sex with multiple partners). Wolf's intentions did not necessarily change all that quickly.[5]

Concerning the questions of whether the American Embassy considered Wolf an inappropriate sponsor and whether Wolf recommended Ms. Viravong have an abortion, I do not believe their effect had a material influence on the jury considering the other abundant evidence presented. Indeed, if the questions were as off-base and fabricated as the majority suggests, they could also have had a negative impact on the prosecution's image in the eyes of the jury. The questions could have served to put the jury on the alert as to future prosecutorial allegations and stiffened the prosecution's burden of proving subsequent allegations. More importantly, the jury hardly needed these questions to find Wolf a man of dubious morals. I refuse to view the jury in this case as a naive and vulnerable group led to believe the baseless due to inappropriate prosecutorial scheming. There was sufficient credible and reliable evidence to convict and I do not believe the cumulative effect theory of the majority is applicable under the circumstances of this case.

I do not feel compelled to spend much time on the majority's assertion defendant's counsel lacked the requisite minimal professional competence. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court stated:

> Conflict in interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice.... The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* [104 S.Ct.] at 2067–2068.

4. The majority acknowledges there was evidence Wolf's interest in settling Southeast Asian refugees was "strongly colored by lust"—i.e., a dominant purpose.

5. The majority also objects to the prosecution asking the question, "Did you pay her parents for her?" referring to Wolf's relationship with a 14 year-old Thai girl. The majority suggests the question misleading since while Wolf gave the girl's parents money, it apparently was for medical treatment and there is no evidence the girl was "given" in an exchange. Assuming *arguendo* this was misleading, it hardly reaches constitutional dimensions under the circumstances of this case. Further, it was revealed Wolf and his wife slept in the same bed with the 14 year-old. Wolf testified this was Tai custom but, arguably, wasn't the jury entitled to infer what Wolf's intentions were here as well, in light of the other evidence? I'm not as sure as the majority as to what Wolf's intentions were here.

The majority suggests the defense counsel's failure to object to the jury instruction discussed above or offer a "dominant purpose" instruction is incomprehensible. I do not believe counsel's failure to object to the instruction reached "incomprehensible" proportions. The instruction asked for a finding of cause and intent while transporting. While other verbiage may have been more desirable, the instruction was hardly as off-base and prejudicial as the majority claims. The majority also asserts defense counsel's failure to object to hearsay testimony and a number of the government's questions on cross-examination constitutes rather obvious reversible error. Yet this case would not represent the first time this court affirmed a conviction even though defense counsel failed to object to elementary hearsay. The *Strickland* criteria above is quite stiff. After reviewing the areas highlighted by the majority, I cannot so confidently conclude there is a reasonable probability these tactical errors cost defendant the trial as *Strickland* requires.

I conclude by saying that after all the high-level hair-splitting analysis of the majority is sifted through, I get the gut feeling the jury heard much more than enough admissible evidence against Mr. Wolf than needed to convict. More objections by defense counsel and a slightly, immaterially-altered instruction would not have made the difference. I have no problem concluding, as the jury did, that a dominant purpose behind defendant's actions was to have these women have sexual relations with him. I see little evidence defendant did anything positive on any consistent basis for these women. Many of defendant's actions are just outright shocking and disgusting and are well-documented. This court has had little problem recently employing the harmless error doctrine to uphold reasonable jury verdicts. In recent years the court has become offended by what it sees as the success of highly technical defense counsel arguments which are used to excite the intellectual juices of the judiciary and secure reversals despite reasonable jury verdicts. This decision, unfortunately in my judgment, represents that problem.