Bennie CUNNINGHAM, Petitioner–
Appellant,

v.

Howard A. PETERS, III,*
Respondent–Appellee.

No. 90–1858.

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1991.

Decided Aug. 21, 1991.

Thomas Peters (argued) Chicago, Ill., for petitioner-appellant.

Richard S. London, (argued), Terence M. Madsen, Asst. Attys. Gen., Crim. Appeals Div., Chicago, Ill., for respondent-appellee.

* At oral argument, a judge on this panel requested that counsel for the state provide the court with name of the proper respondent. Having received counsel's memo, we have substituted the incumbent Director of the Illinois Department of Corrections, Howard Peters for Michael Lane pursuant to Fed.R.App.P. 43(c)(1).

Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Bennie Cunningham appeals from the denial of his petition for habeas corpus. He raises only one issue: whether a state trial court violated his constitutional right to a fair trial when it barred testimony that another person had confessed to the charges facing him. We affirm the refusal of the district court to issue the writ.

## BACKGROUND

Kahlil Matariyeh and his wife Suhalia operated a food and liquor store called Tina's on Chicago's southside. At about 8:15 p.m. on March 12, 1981, they were standing in front of their car outside the store along with two employees, Michael Hudson and a man named Farris. As the Matariyeh's two sons, Nabil and Suleiman, were locking up the store, three men approached to within ten feet, announced a holdup and pulled out their guns—one was armed with a shotgun and the other two had handguns. Kahlil responded by pulling out his handgun. It is unclear who fired first, but a gun battle ensued. The three gunmen then fled on foot. Kahlil was badly wounded by the gunmen in his left forearm and hand, his left foot and his abdomen. During the confusion, Kahlil's gun fired a shot which killed his wife Suhalia.

Afterward, Suleiman told the police that the man with the shotgun was six feet tall and that the other men were approximately five feet seven inches tall. None of the Matariyeh's had seen the gunmen before the occurrence. The father and his sons separately identified Cunningham, Milam Martin and Kevin Wallace as the gunmen from photographs. While Kahlil was still in the hospital recovering, Nabil and Suleiman identified Cunningham in a lineup. Later, all three identified Martin in another lineup.

A joint jury trial of Cunningham, Martin and Wallace was held in state court. At trial, Suleiman testified that Hudson had asked for and received all of his pay on the day of the robbery even though it was not payday. Also he saw Hudson duck behind a car before the gunmen began shooting. Hudson never returned to work after that day. Suleiman also said that the police brought Farris—the other employee—to one of the lineups, but Farris refused to take part in any other photographic or lineup identifications. Suleiman identified Cunningham in court saying that he looked directly at Cunningham from a distance of eight feet as Cunningham fired on him.

Nabil testified that Hudson hid behind a car as soon as the gunmen announced the holdup. He also identified Cunningham as the man who shot at Suleiman. He denied telling the police on the night of the shooting that his father drew his gun as soon as the defendants announced the holdup, and admitted he was wrong in estimating that Cunningham was about three inches shorter than Wallace. Kahlil also testified and identified Cunningham as the man who was shooting at Suleiman. He said that he believed Martin—the man with the shotgun—announced the holdup.

Chicago police detective Frank Laverty testified that after interviewing people in the area of the store, he began looking for three individuals known as Fruitloops, Shalom and Daddy Stone. He said he later learned that Fruitloops was Wallace and Shalom was Martin. Detective Laverty said that he interviewed Hudson, but that Hudson would not view any photos or lineups and refused to cooperate. Laverty added that he did not recall Wallace having crutches when he was arrested on March 21.

Hudson testified for the defense. He said that he had worked at Tina's for five years at the time of the shooting. He stated that the gun battle started when Kahlil drew his gun and that as the shooting started, he ran across the street, as did Nabil and Suleiman. According to him no one shot at Suleiman.

Hudson said that Wallace, who he met a few months before the incident, was not one of the three gunmen. He gave this testimony despite his claims that the police had warned him not to testify on behalf of

Wallace. He added that he had seen Wallace on crutches only a few days before the robbery. He testified that on the night of the shooting he told police that he recognized the tallest gunman and that this man was a good friend of Wallace's brother. He had seen this man hanging around the street corner drinking wine and that he saw the man inside the courtroom at one point during Cunningham's trial. He explained that he failed to cooperate with the investigation because the police were harassing him.

Bernard Merritt, an eye-witness and Cunningham's neighbor, testified that he viewed the holdup from a distance of eighty feet and that none of the defendants were involved. He stated that the shortest of the three gunmen was a "gang banger" named Floyd Murray, who was also known as "Main." He said that he did not wait for the police to arrive at the scene, nor did he go to the police with this information about "Main." He came forward over one year later after being contacted by Cunningham's attorney to "see justice done."

Cunningham's uncle, Herman Cunningham, testified that Cunningham arrived at his automobile repair shop at around 3:30 p.m. on the day of the robbery and that they worked on Cunningham's car until about 9:30. He dropped Cunningham off at his mother's house between 11 and 11:30 p.m. He said that even though he learned of Cunningham's arrest shortly after it occurred, he did not tell anyone that Bennie was working in his shop on the night of the murder until contacted by Cunningham's attorney.

Co-defendant Wallace's grandmother, Willie Tipton, testified that Wallace lived with her and that she had picked him up at South Shore Hospital on March 6, 1981—six days before the shooting—where he had been treated for a gunshot wound in the leg. He left the hospital with a cast from his knee to his toes and used crutches. She said the cast came off on March 20, the day before he was arrested and that he had a crutch with him when arrested. She said she never saw Wallace with either Cunningham or Martin.

Dr. Richard Egwele testified that he treated Wallace on March 2 for a gunshot fracture to the right fibula. He told Wallace to use crutches to keep weight off the leg. He said that the fracture would not have been fully healed by March 12, the date of the shooting. He added that whether Wallace could have placed weight on the leg without the crutch at that time was a difficult question because the affected bone was not weight carrying.

In rebuttal, Paula DaLeo, an assistant state's attorney, testified that when Wallace was arrested on March 21, he was not wearing a leg splint or using crutches. Thomas Gainer, an assistant state's attorney, testified that in February 1982, Hudson refused to identify anyone in the case. According to Gainer, Hudson told him that he had left the job at Tina's and moved from the southside to the westside because he was afraid of gang activity in the old neighborhood and that he knew all three defendants from the neighborhood. Detective Laverty testified that on the day after the shooting, he asked Hudson whether he knew some El Rukns named Fruitloops and Jerry Cunningham, the petitioner's brother. According to Laverty, Hudson looked surprised and asked how Laverty had obtained Cunningham's name. Hudson then said that he would not cooperate in any way whatsoever. This conversation took place before any of the three defendants were arrested.

The state court jury found Cunningham, Martin and Wallace guilty of murder, attempted murder and attempted armed robbery. The trial court sentenced Cunningham to extended terms of 70 years for murder, 80 years for attempted murder and 15 years for attempted robbery to be served concurrently. On appeal to the Illinois Appellate Court, Cunningham raised several issues, including whether the trial court improperly barred the testimony of a defense investigator who would have testified that a man named Vincent Yokum had confessed to the crime and exonerated Cunningham. The appellate court affirmed, holding that while the statements were self-incriminating and against interest,

they were not made spontaneously, within a short period after the crimes or to a close acquaintance. *People v. Cunningham,* 130 Ill.App.3d 254, 264, 85 Ill.Dec. 138, 146, 473 N.E.2d 506, 514 (1984). The appellate court added that the statements were not corroborated by other evidence and that Yokum was unavailable for cross-examination because he had pleaded the fifth amendment. The Illinois Supreme Court denied a petition for leave to appeal. *People v. Cunningham,* No. 61343 (Apr. 2, 1985).

In January 1990, Cunningham filed a petition for habeas corpus in district court. In the petition, Cunningham again claimed that Yokum admitted to defense investigators that he was involved with the shooting and that Cunningham was not one of the assailants. The petition also stated that at trial Hudson would have identified Yokum as the gunman.

The district court denied the petition, holding that Yokum's exculpatory statements were not corroborated. The state had no opportunity to cross-examine Yokum because he had invoked the fifth amendment. More importantly, the court noted that Yokum's statements were made to defense investigators seventeen months after the crime, adding that defense investigators are similar to "mere cellmates" making statements made to them untrustworthy. The district court also held that Cunningham was not denied a fair trial by the state trial court's refusal to require Yokum to appear at trial so that Hudson could identify him as a perpetrator because Yokum had invoked the fifth amendment and an accused's right to compulsory process does not include the right to compel a witness to waive his fifth amendment privilege.

### ANALYSIS

Cunningham argues on appeal that his right to a fair trial was violated when he was denied the opportunity to present the investigative report of Yokum's confession. He contends that Yokum's confession was reliable because it was made while Yokum was in state custody, was given to another person's attorney and investigator, and the details of the confession match the facts given by eye-witnesses Hudson and Merritt.

At the outset, we must address the state's contention that Cunningham has waived the only argument he presents on appeal. Cunningham has made one argument consistently: that the trial court improperly applied *Chambers* to the hearsay testimony regarding Yokum's confession. He has raised this argument in both state and federal courts. It is irrelevant that he has cited in his appellate brief *United States v. Garcia,* 897 F.2d 1413 (7th Cir. 1990), a case decided after the decision of the district court.[1]

This case presents a conflict between the rights of criminal defendants under the sixth and fourteenth amendments to present evidence in their own defense and the state's "sovereign prerogative" to regulate the presentation of evidence in its courts. *Johnson v. Chrans,* 844 F.2d 482, 484 (7th Cir.), *cert. denied,* 488 U.S. 835, 109 S.Ct. 95, 102 L.Ed.2d 71 (1988). In accordance with the Supreme Court's analyses in *Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979) (*per curiam*), and *Chambers v. Mississippi,* 410 U.S. 284, 300–01, 93 S.Ct. 1038, 1048–49, 35 L.Ed.2d 297 (1973), this court employs a balancing test to resolve the conflict. Our task is to evaluate the exculpatory significance of relevant and competent evidence and then balance it against the competing state interest in the procedural rule that prevented the defendant from presenting this evidence at trial. *Johnson,* 844 F.2d at 484; *McMorris v. Israel,* 643 F.2d 458, 461 (7th Cir.1981).

In *Chambers,* the defense had sought to introduce an out-of-court statement in which the declarant apparently announced

---

1. Cunningham raised another issue in his petition, whether the trial court erred in refusing to order Yokum to appear at trial to have Hudson identify him as the perpetrator of the crime. He has made no mention of this argument on appeal and it is waived. *Patrick v. Jasper County,* 901 F.2d 561, 570 (7th Cir.1990).

that he, and not the defendant, had committed the killing at issue. The state trial judge barred the evidence because the state hearsay rule did not contain an exception for declarations against penal (as opposed to pecuniary) interest. 410 U.S. at 299, 93 S.Ct. at 1048. Moreover, the state's "voucher" rule, which prohibited parties from impeaching their own witnesses, barred Chambers from calling the declarant to the stand and introducing his out-of-court statement against him. *Id.* at 295–96, 93 S.Ct. at 1046–47. The Supreme Court held that local rules of evidence cannot be applied "mechanistically" when such rules would threaten the "fairness and reliability [of] ... the ascertainment of guilt and innocence" and thereby "defeat the ends of justice." *Id.* at 302, 93 S.Ct. at 1049. In assessing the reliability of the hearsay testimony, the Court in *Chambers* found that some exculpatory statements contained a "persuasive assurance of trustworthiness," because (1) the confession was spontaneously made to two close acquaintances shortly after the murder occurred; (2) each statement was corroborated at trial by other independent evidence; (3) the confession was self-incriminating and unquestionably against penal interest; and (4) the declarant was available for cross-examination. *Id.* at 300–01, 93 S.Ct. at 1048–49.

In *Green,* the evidence at trial had shown that Green and another defendant abducted a woman, then raped and murdered her. At the death penalty phase of the trial, Green attempted to introduce the testimony of Thomas Pasby, who had testified for the state at the other defendant's trial. 442 U.S. at 96, 99 S.Ct. at 2151. According to Pasby, the other defendant had confided to him that he had killed the victim. The trial court refused to admit this testimony at Greene's sentencing trial because it was hearsay. The Court reversed and remanded the denial of the writ because the excluded testimony was "highly relevant to a critical issue" and "substantial reasons existed to assume its reliability." *Id.* at 97, 99 S.Ct. at 2151. The Court stated that the other defendant made the statement to a close friend and that the corroborating evidence was sufficient to procure that defendant's conviction and capital sentence. The defendant's statement to Pasby was also against interest, and there was no reason to believe that he had any ulterior motive in making it. The Court concluded that "[p]erhaps most importantly, the State considered [the hearsay evidence] sufficiently reliable to use against [the other defendant] and base a sentence of death upon it." *Id.*

■ In applying *Chambers,* this court has stated that when the hearsay rule, combined with other doctrines and circumstances, conspires to deprive the accused of a fundamentally fair trial, the legal rule yields. *Gomez v. Greer,* 896 F.2d 252, 253 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 355, 112 L.Ed.2d 318 (1990). But in close and difficult cases, the Constitution does not empower a federal court to arrive at conclusions concerning state law, inconsistent with those of the state's own tribunals. *United States ex rel. Bracey v. Fairman,* 712 F.2d 315, 317 (7th Cir.1983) (exculpatory evidence inadmissible based on relationship between witness and the accused, conflict in her story with medical evidence, and readiness with which she made and withdrew her confessions of guilt).

In *Rivera v. Director, Dept. of Corrections,* 915 F.2d 280 (7th Cir.1990), this court granted the writ where a hearsay rule combined with unusual circumstances similar to those in *Green* to deny a defendant a fair trial. The state trial court had refused to admit an exculpatory confession made by a co-defendant, even though the confession was reliable enough to have been admitted at the co-defendant's separate trial as a statement against penal interest. *Rivera,* 915 F.2d at 282. We made explicit what the Supreme Court implied in *Green,* that there is a reciprocal relationship between hearsay evidence that was sufficiently reliable to have been offered against an accused and then later offered in a co-defendant's favor. The court noted that without the confession, the case turned on Rivera's word against another

defendant's, who had been convicted of the same murder at a separate trial.

■ Cunningham is correct on one score: the trial court improperly required him to meet all four *Chambers* factors before the confession would be admitted. This was the law in Illinois until corrected by the Illinois Supreme Court in *People v. Bowel*, 111 Ill.2d 58, 68, 94 Ill.Dec. 748, 753, 488 N.E.2d 995, 1000 (1986), which now requires only a "considerable assurance" of reliability by objective indicia of trustworthiness. *Id.* (citing *Chambers*, 410 U.S. at 300–01, 93 S.Ct. at 1048–49). The Illinois Appellate Court in this case applied the stricter test, but concluded that "[e]ven under the most flexible analysis of these indicias [sic], we believe the circumstances here could not be said to provide the necessary reliability for the admission of Yokum's statement." *Cunningham*, 130 Ill. App.3d at 265, 85 Ill.Dec. at 146, 473 N.E.2d at 514. Like Illinois after *Bowel*, this court in applying *Chambers* has concluded that the factors are not exhaustive or absolute. *Sharlow v. Israel*, 767 F.2d 373, 377 (7th Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986).

The first question for us in this case under *Chambers* is whether Yokum's confession was made spontaneously to a close acquaintance shortly after the offense. The most serious problem presented by the facts before us—unlike the situation in *Chambers, Green* or *Rivera*,—is that Yokum may have had an ulterior motive in making the confession. First of all, Yokum made the confession *17 months* after the robbery attempt. This long stretch of time cuts against finding a credible confession. In *Chambers*, two confessions were given by McDonald on the same night of the shooting, and one was given the next day. 410 U.S. at 292, 93 S.Ct. at 1044; *see United States v. Guillette*, 547 F.2d 743, 754 (2nd Cir.1976) (confession made four months after crime held inadmissible).

Even more damaging to Cunningham's case, one week prior to making the confession Yokum told a sheriff's investigator and an assistant state's attorney that Wallace—one of Cunningham's co-defendants—had approached Yokum in the county jail and asked him to provide an alibi. Yokum told the state's attorney that he had refused. One week later Yokum in fact provided a full confession including corroborating details to Cunningham's attorney and his investigator. This sequence of events raises considerable doubt about the spontaneity of the statement. In fact it suggests that Yokum—either voluntarily or under a threat of coercion—was taking the rap for Cunningham's offenses. This factor distinguishes this case from *Rivera* where there was no suggestion that the witness had any motive to exculpate the defendant.

As to the nature of those to whom Yokum made his confession, the district judge compared Cunningham's investigators to "mere cellmates" because they were not Yokum's close acquaintances. We think this may stretch the analogy a little too far. Yokum must have had some idea that he could be prosecuted for his admitted conduct to Cunningham's defense counsel. On the other hand, Yokum did not make the statement to police investigators, in which case the specter of prosecution would have been obvious. *See Rivera*, 915 F.2d at 282.

The next question under the *Chambers* test is whether Yokum's confession was corroborated. In the confession, Yokum implicated a man named Floyd. Merritt, the eye witness for the defense, also testified that one of the gunmen was a "gang banger" named Floyd Murray, but Merritt was not necessarily a disinterested witness. For one thing, he was Cunningham's neighbor. For another, he was not interviewed by police at the time of the shooting though he claimed to have been there, but came forward over one year later when contacted by Cunningham's attorney.

Hudson was willing to identify Yokum as one of the gunmen, which would have leant further corroboration to Yokum's confession. But Hudson also had credibility problems. He asked for his pay check on the day of the shooting even though it was not payday, thus creating an inference that he

knew a robbery might occur. He never returned to work after that day, even though he had worked at Tina's for five years. Hudson also may have been coerced into testifying in Cunningham's favor. Despite his early cooperation at line-ups, he refused to cooperate once he was told that someone named Cunningham was a suspect in the case.

Also on the question of credibility, this case does not boil down to the defendant's word against another guilty party as it did in *Rivera*. 915 F.2d at 281. There is other ample evidence of Cunningham's guilt. Most notably, three eye-witnesses, Kahlil and his two sons who were no more than ten feet from the assailants, consistently identified Cunningham and his two cohorts in photo identifications, several lineups and at trial.

■ As to the final *Chambers* factors, Yokum's confession was unquestionably self-incriminating and against interest, but Yokum was not available for cross-examination having taken the fifth amendment. However, Yokum's unavailability is not dispositive. While the declarant in *Chambers* was available to be cross-examined about the truth of his out-of-court statements, the Court in *Green* applied the *Chambers* rational when the declarant was not available for cross-examination.

Balancing the forgoing factors regarding Yokum's confession, we agree with the district court. Cunningham was not denied a fair trial by the exclusion of the investigator's hearsay testimony about Yokum's confession. The length of time between the crime and Yokum's inculpatory statement combined with the efforts by Wallace to "encourage" Yokum to "provide an alibi" for him make Yokum's statement sufficiently unreliable to deny admission at trial.

## CONCLUSION

Because Cunningham was not denied a fair trial by the exclusion of evidence concerning Yokum's confession, the decision of the district court to deny the writ of habeas corpus is AFFIRMED.

EASTERBROOK, Circuit Judge, dissenting.

Three black youths tried to rob a grocery store run by the Matariyeh family. A gun battle erupted. The three surviving Matariyehs identified Cunningham as one of the robbers. No physical evidence links Cunningham to the crime. All eyewitness testimony is problematic, given the frailties of human memory. Identification by members of other races is especially so. See Sheri Lynn Johnson, *Cross–Racial Identification Errors in Criminal Cases*, 69 Cornell L.Rev. 934 (1984) (collecting empirical studies); Stephanie J. Platz & Harmon M. Hoch, *Cross–Racial/Ethnic Eyewitness Identification: A Field Study*, 18 J. Applied Social Psychology 972 (1988). The Matariyehs had never seen the robbers before and based their identifications on brief views on a dark street at night under high stress. Two black eyewitnesses said that Cunningham did not participate but implicated Vincent Yokum, who later confessed to taking part.

This set the stage for a clash of stories at trial. Yet the court excluded Yokum's confession as hearsay. So it was; Yokum was unwilling to inculpate himself on the stand. Perhaps Yokum's confession was questionable, but then the Matariyehs' identification was not infallible either. The Matariyehs initially told the police that one robber (holding a shotgun) was five to seven inches taller than the others, who wielded pistols. Cunningham and the other two persons the Matariyehs selected from photo spreads turned out to be the same height. The state court not only prevented the jury from hearing Yokum's confession but also refused to order Yokum (then in jail) brought to court so that Michael Hudson, an employee of the Matariyehs who witnessed the events, could identify him as a robber. The twin exclusions of Yokum's confession and Yokum's face increase the risk that an innocent person has been convicted. *Chambers v. Mississippi*, 410 U.S. 284, 298–303, 93 S.Ct. 1038, 1047–50, 35 L.Ed.2d 297 (1973), and *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), hold that states must allow defen-

dants to put third-party confessions before the jury, despite the hearsay rule, when necessary to assist in separating the guilty from the innocent. I believe that *Chambers* and *Green* require Illinois to give Cunningham more leeway to explore Yokum's role.

*Lee v. McCaughtry*, 933 F.2d 536, 538 (7th Cir.1991), suggests that a federal court should accept the state's resolution of arguments under *Chambers*. Collateral attack is not an occasion to re-balance fact-specific conclusions. Illinois does not ask us to refrain from deciding the *Chambers* question, however, and for good reason—the state courts botched the job. The trial judge excluded Yokum's statement just because it was hearsay, without endeavoring to apply the *Chambers* standards. The Appellate Court affirmed because it believed that a declaration against penal interest is admissible only if *all* of the circumstances in *Chambers* recur. *People v. Cunningham*, 130 Ill.App.3d 254, 264, 85 Ill.Dec. 138, 146, 473 N.E.2d 506, 514 (1st Dist.1984). The court wrote that unless a declaration against penal interest is spontaneous, corroborated, and made to a close acquaintance shortly after the crime, and the declarant is available for cross-examination, the statement is inadmissible. That misunderstands *Chambers*, as *Green* and subsequent cases show. E.g., *Rivera v. Director, Department of Corrections*, 915 F.2d 280 (7th Cir.1990); *Gomez v. Greer*, 896 F.2d 252, 254 (7th Cir.1990). Illinois abandoned its mechanical approach to third-party confessions in *People v. Bowel*, 111 Ill.2d 58, 67–69, 94 Ill.Dec. 748, 752–753, 488 N.E.2d 995, 999–1000 (1986), too late to do Cunningham any good.

As we have understood *Chambers*, the essential question is whether the confession is reliable. "How reliable must hearsay be to fit the *Chambers* approach? We concluded in *Rivera* [915 F.2d at 282], that if a confession is sturdy enough for the state to use in its own case—if it is the sort of evidence that prosecutors regularly use *against* defendants—then defendants are entitled to use it for their own purposes." *Lee*, 933 F.2d at 537 (emphasis in original). Yokum confessed to two attorneys and an investigator representing Cunningham. Yokum knew that the persons to whom he was speaking represented interests adverse to his; he was in custody and readily available if the state should decide to prosecute him. His was a declaration against penal interest with the customary indicia of reliability. Yokum did more than take responsibility. He described the gun battle in detail, adding the names, clothing, and armament of the aggressors. Hudson was ready to corroborate Yokum's statement by identifying Yokum, and the two men Yokum named as confederates, at trial as the robbers. Bernard Merritt added support for Yokum's statement. Merritt, who saw the events from 80 feet away, recognized one of the assailants as Floyd Murray, a thug known as "Main", and did not know the others; Merritt was certain that Cunningham, whom he did know, was not among the three. Yokum recounted that his accomplices included a Floyd called "Main". Yokum's formal, detailed admission is the sort of statement police regularly obtain from suspects, and prosecutors regularly use against defendants.

As my colleagues observe, the prosecutor could have undermined Yokum's statement. Yokum kept mum for 17 months after the gun battle. He spoke eight days after receiving a visit in prison from Kevin Wallace, one of the defendants, who asked Yokum to take responsibility. Yokum found Wallace's inveiglement unwelcome and reported the encounter to the state's attorney. Hudson was not the most cooperative of witnesses immediately after the crime; perhaps he was trying to protect Cunningham and the other defendants out of friendship or fear. Yet for all this Yokum's confession retains vitality. Many suspects confess to the police only after repeated inquiries and appeals to their self-interest. Confessions do not become inadmissible because the speakers may have had motives other than remorse. Anyway, what did Wallace say to Yokum? Was Wallace appealing to Yokum's conscience, or to his health? That Cunningham and Wallace belong to the El Rukns, a vicious gang, suggests the latter, but we do not

know. Illinois did not think this mattered; it does. Yokum has never repudiated the confession or attributed it to pressure from the defendants. Yokum invoked the fifth amendment when declining to testify for the defendants, a step necessary only if Yokum believes that his testimony would have been inculpatory. Any testimony that would have inculpated Yokum would have exculpated Cunningham.

Convictions based on eyewitness identification are acceptable not because we are sure that eyewitnesses are right, but because the alternative would immunize too many guilty persons. When cross-race eyewitness identification alone supports a prosecution, it is especially important to admit other evidence that bears on the reliability of that identification. Yokum's confession, although less powerful than one given to police immediately after the crime, is reliable enough to assist the jury in evaluating the Matariyehs' identifications. *Chambers, Green,* and our own cases required Illinois to let the jury have this information. Trial without it created an unacceptable risk of convicting the innocent.