**UNITED STATES of America ex rel. Robert GOOCH, Petitioner,**

v.

**Richard D. McVICAR, Respondent.**

**No. 96 C 783.**

United States District Court, N.D. Illinois, Eastern Division.

Jan. 27, 1997.

Robert Gooch, Menard, IL, pro se.

Arleen C. Anderson, Darryl Belmonte Simko, Illinois Attorney General's Office, Chicago, IL, for Richard McVicar, Attorney General of the State of Ill.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Robert Gooch, a prisoner at Shawnee Correctional Center in Vienna, Illinois, brings a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition Gooch argues that (1) the state trial court's failure to admit evidence that his cousin, Ryan Gooch, confessed to committing the murder in question violated his due process right to a fair trial; (2) his trial attorney's failure to tender a lesser offense jury instruction constituted ineffective assistance of counsel in violation of the Sixth Amendment; and (3) the state prosecutor's misstatement of the law and reference to facts not in evidence during his closing statement violated petitioner's due process right to a fair hearing. For the reasons set forth below, the petition is granted.

### FACTS [1]

At petitioner's trial, 14–year–old Angela Hauser testified that on December 26, 1991,

---

1. Our recital of the facts relevant to Gooch's petition is taken from the order of the Illinois

she was visiting her neighbor, Susanna Marrs. Petitioner's younger brothers Anthony and Jeremy, and cousins Terrell and Dale, were also at Marrs' apartment playing video games. Marrs' friends Robert Eskridge, David Wheeler and Eugene Unger were also in and out of the apartment throughout the day. Eskridge had argued with the Gooches and was mad at them.

At approximately 10 p.m. Angela left Marrs' apartment and returned to her own apartment. At midnight, petitioner, along with Anthony, Terrell, and Ryan Gooch, came to Angela's apartment to ask if she knew where Eskridge was. According to Angela, petitioner said that Eskridge had broken a window in his mother's car. Angela then heard Anthony mumble something and thought he said, "We're going to pop him." Angela told the Gooches that Eskridge was either at Susanna Marrs' apartment or at home.

Susanna Marrs testified that on December 26, 1991, at about midnight, Anthony Gooch came to her door and asked if Eskridge was there. Eskridge was, and Anthony accused him of breaking the window in his mother's car. Eskridge, who had been drinking, did not appear upset or threatening; he confronted Anthony on the patio balcony and said he did not know anything about the broken window. Anthony turned and walked down the steps from the balcony. Marrs testified that at that point "two more people came out of nowhere." She recognized one of the persons as petitioner. He was wearing a Raiders Starter jacket and was standing at the bottom of the stairs with another boy who was wearing a black trench coat.

Marrs testified that petitioner asked Eskridge what happened to the car window and Eskridge denied knowing anything about it. The accusation and denial were repeated several times, with Eskridge raising his voice and getting irritated. Petitioner then shot Eskridge. Marrs did not see the gun being pulled out, but she saw petitioner raise his arm and a flash when the gun was fired. Marrs admitted she may initially have con-

fused the names and told police that Anthony was the shooter. At trial, though, she testified that petitioner definitely was the man who shot Eskridge.

Eugene Unger testified that he was at Marrs' apartment when the shooting occurred. Unger was in Marrs' bedroom when someone knocked at the back door. Marrs answered the door and Unger heard someone complaining about a broken car window. When Unger looked out the bedroom window he saw one person walking down the stairs and two others at the bottom. While Eskridge was arguing about the broken car window someone pulled out a gun and shot him. Unger acknowledged that he initially told police that petitioner's brother Anthony fired the shot. However, Unger testified that later that night he identified petitioner as the shooter, as he viewed him in a squad car. According to Unger, petitioner was wearing a black or blue "long trench coat like." Unger did not see petitioner pull out the gun, but did see him fire it. Unger also positively identified petitioner in court.

Police Officer Frank Christian testified that on the night of the shooting, approximately two or three blocks from the crime scene, he saw a group of suspects who matched the description of the assailants. Christian took these suspects, including petitioner, into custody. Christian then brought petitioner and his brother Anthony to the crime scene, where Marrs and Unger identified petitioner as the shooter.

Police Officer Thomas Stein testified that in the early morning hours of December 27, 1991, he interviewed Ryan Gooch. Stein testified that Ryan took them to the home of a man named Euron Matthews, who turned over a .22–caliber revolver. The parties stipulated that if called to testify the state's ballistics expert would tell the jury that the .22–caliber projectile recovered from Eskridge's body was too mangled to identify as being fired from a particular weapon.

Finally, Officer Kevin Soland testified that on December 26, 1991, there was a report of

Appellate Court in *People v. Gooch*, No. 3–92–0626, 258 Ill.App.3d 1091, 221 Ill.Dec. 166, 674 N.E.2d 959 (1994), pursuant to 28 U.S.C.

§ 2254(e)(1). *See Sumner v. Mata*, 449 U.S. 539, 545–46, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981).

criminal damage to property occurring in the area of the shooting. The back window of a car belonging to the defendant's mother, Betty Gooch, had been damaged. According to Soland, David Wheeler had been arrested and charged with that crime.

After resting its case, the state made a motion *in limine,* asking the court to bar petitioner from eliciting testimony as to a confession Ryan Gooch made to the police. The state argued that the confession was inadmissible because it was hearsay. Petitioner countered that the confession was admissible because (1) it was a statement against penal interest; (2) it was or would be corroborated by evidence; and (3) it was trustworthy in that it was made to police, and to the declarant's father, who was also in the room.

Petitioner then made an offer of proof which established that Ryan was arrested when his father brought him down to the police station in the early morning hours of December 27, 1991, after learning police wanted to talk to him as a witness.[2] Ryan initially denied any knowledge of the shooting. He stated that he and petitioner were involved in an argument with Eskridge over a broken car window. Detective Stein then told Ryan that he felt petitioner was the shooter and that Ryan was a witness. Ryan told Stein that he was wrong and that he, Ryan, had shot Eskridge. He went on to say that he had the gun for a while and kept it outside. He identified the gun, as A .22-caliber revolver that he threw in the river after the shooting. At that point petitioner was brought into the room. Ryan then told petitioner that he had told police that he shot the victim. Next, Ryan took the police to Euron Matthew's house, where Ryan identified a weapon as being the one used in the shooting.

Ryan then gave a detailed statement, indicating that he and petitioner drove to Euron Matthews' house, where Ryan got his gun. They went to confront Eskridge at Marrs'

apartment. Anthony went up the stairs to Marrs' back door while Ryan and petitioner stayed on the lawn. Anthony knocked on the door and confronted Eskridge about the broken car window. Eskridge denied breaking it and told Anthony to leave. Ryan and petitioner then started yelling at Eskridge. As Eskridge moved toward them, Ryan took out the gun and shot him. After he fired the shot they all ran. Ryan and petitioner then drove back to Matthews' house, where Ryan hid the gun.

The court was apprised that if Ryan were called to testify he would refuse to do so since it might incriminate him. The court subsequently granted the state's motion to bar evidence of Ryan's confession.

Police Officer Michael Botzum testified for the defense that he was the first officer on the scene after the shooting. Eskridge's body was lying on the kitchen floor and Susanna Marrs, David Wheeler and Eugene Unger were there. Unger told Botzum that Anthony Gooch shot Eskridge.

Officer Michael O'Neill testified that in the early morning hours of December 27, 1991, he interviewed Angela Hauser and her mother. O'Neill did not recall Hauser or her mother stating that they heard the people looking for Eskridge say they were going to "pop" him.

The 18-year-old petitioner testified that he was home on the evening of December 26, 1991, with his cousin Ryan and two girls whom Ryan knew. Sometime between 10 p.m. and 11:30 p.m. petitioner's brothers Anthony and Jeremy, and cousins Terrell and John, came over. They said that Eskridge and another man had chased them and threatened to beat them up if they did not stay away from Angela Hauser. Petitioner knew that Eskridge was a gang member and the type of person they did not want to "mess with." He advised the group to "leave it alone" and not go back over to Hauser's home.

---

**2.** The record is ambiguous with respect to the timing of Ryan Gooch's arrest. In the state's motion *in limine* at trial, the prosecutor argued that Ryan was arrested following the incident and during the course of the investigation was *Mirandized.* Subsequent to this, Ryan made the

confession. In the defendant's offer of proof, his attorney argued that Ryan was "arrested as a witness in this offense, and he was brought down to the police station by his father after the police notified them that they wanted to talk to him as a witness." (Resp. Ex. C. at 242).

Anthony and the others returned later and said that Eskridge had broken a window on their mother's car. Petitioner then went outside and saw that two beer bottles had been thrown through the back window of the car. He started walking across the alley to talk to Eskridge, but Ryan stopped him. The girls who were with Ryan wanted to go home. Petitioner then got in the car with Ryan, who drove the girls home. After that, Ryan drove to Euron Matthew's house to get a gun. Petitioner did not want the gun, but knowing Eskridge and other gang members were at the apartment, he did not object. Petitioner assumed Ryan got a gun from Matthews, although he did not see one at that time.

Upon returning home, petitioner, Ryan, Anthony and Terrell went to talk to Eskridge about the window. Petitioner testified that he had no intention of harming Eskridge in any way—he did not expect a fight, but acknowledged that he was a little angry. He contended that he simply wanted to confront Eskridge to find out what happened, and get an apology.

Petitioner and the others first went to Angela Hauser's apartment and told her that Eskridge had chased and threatened them. Hauser told them she thought Eskridge was at Marrs' apartment. Petitioner did not hear anyone say that they were going to "pop" Eskridge.

Anthony and Terrell left immediately for Marrs'. By the time petitioner got there Anthony was up on the patio balcony. Petitioner and Ryan were looking up at Anthony and Eskridge, who were arguing with raised voices. At that point petitioner asked Eskridge why he broke the window and chased the others. Eskridge denied breaking the window. Petitioner responded that he did not want to call the police but that he wanted to know what had happened. Eskridge again denied involvement. At that point petitioner noticed Anthony making a sudden movement, as though he was about to be hit. Petitioner yelled, "Don't hit my brother," and the argument escalated with Eskridge saying, "You keep talking crazy, I'll pop you, you keep talking crazy."

As the defendant was saying, "Just forget it. Let's go," and Anthony was coming down the stairs, the defendant saw Ryan pull out a gun and shoot Eskridge. After the shot, everyone ran. Ryan then took the gun back to Matthew's house to hide it. Petitioner speculated that the state's witnesses were mistaken in their testimony because the area was poorly lit. However, petitioner acknowledged that he looked more like his brother Anthony than he did his cousin Ryan, who was much taller and did not closely resemble him.

The defendant testified that when he was interviewed by Detective Rachel he said he did not mean for anything to happen to Eskridge and that they all just argued with Eskridge. He told Rachel that it was only when he was walking away that he heard a gunshot behind him. The defendant further testified that Detective Rachel then took him into the room where Ryan was being questioned.

During cross examination the prosecutor asked whether the defendant spoke to Ryan at that time. The defendant testified that he did not, because when he was brought into the room Ryan was confessing that he shot Eskridge.

In rebuttal, the state called the defendant's brother Anthony, who testified that he did not know who fired the shot that killed Eskridge, but speculated that it was either the defendant or Ryan. Anthony acknowledged that during his own first degree murder trial he claimed the defendant was the shooter. Anthony then testified that he really did not know whether the defendant or Ryan pulled the trigger because both were standing together.

Detective Rachel testified that he interviewed the defendant while Detective Stein talked to Ryan. Stein then came in and both he and Rachel went to talk to Ryan. Rachel testified that when he came back the defendant asked to talk to Ryan. The defendant told Rachel that he would be able to tell the truth if he had a moment to talk to Ryan.

The jury returned a verdict finding the defendant guilty of first degree murder. The defendant appealed, arguing that (1) the

circuit court erred by granting the state's motion *in limine* to exclude evidence of Ryan Gooch's confession; (2) defense counsel should have tendered a second degree murder instruction based on an unreasonable belief in the need for self-defense; and (3) the prosecutor committed reversible error in closing argument. The appellate court rejected these arguments and affirmed. The defendant's petition for leave to appeal to the Illinois Supreme Court was denied.

## DISCUSSION

### I. Retroactive Application of 28 U.S.C. § 2254(d) as Amended by the Antiterrorism and Effective Death Penalty Act of 1996

■ The Seventh Circuit has recently decided that the amendments to 28 U.S.C. § 2254, which were signed into law on April 24, 1996, apply retroactively to pending habeas petitions. *Lindh v. Murphy,* 96 F.3d 856, 867 (7th Cir.1996). Because petitioner Gooch asks this court to find that the state court decision resulting in his conviction contained constitutional errors, we must apply the newly amended version of § 2254(d)(1). This version forbids federal courts from issuing a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus, under the new habeas statute "[w]e may still determine whether a state court has violated the Constitution, but we may only issue a writ of habeas corpus where this violation also runs afoul of a previous decision of the Supreme Court." *United States ex rel. Wilhoite v. Washington,* No. 96-C-2414, 1996 WL 650444, at *2 (N.D.Ill. Nov. 5, 1996). Lower court decisions applying Supreme Court precedent are relevant points of comparison for

determining whether a state court's application of federal law is "unreasonable" under the statute. *Id.*

### II. Admissibility of Hearsay Confession Against Penal Interest

■ In his first claim for habeas relief petitioner argues that the trial court violated his right to procedural due process by refusing to admit his cousin's confession on the grounds that it was hearsay evidence.[3] Specifically, petitioner asserts that Ryan Gooch's confession to the police on December 27 that he shot Eskridge was a statement against penal interest, with sufficient indicia of reliability to warrant admission under the Supreme Court's decision in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Petitioner asks this court to grant habeas corpus on the ground that the state court decision to exclude the confession was either "contrary to, or involved an unreasonable application of" the *Chambers* doctrine. 28 U.S.C. § 2254(d)(1).

In *Chambers,* the defendant sought to introduce an out-of-court statement in which the declarant apparently announced to three friends that he, and not the defendant, had committed the killing at issue. The state trial court barred the evidence because the state hearsay rule did not contain an exception for declarations against penal interest. 410 U.S. at 299, 93 S.Ct. at 1047–48. The Supreme Court reversed:

> Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest.

---

**3.** At first glance, petitioner's habeas claims are confusing and appear to overlap. However, we must take into account that he is proceeding *pro se* and accord his petition the standard of leniency appropriate for *pro se* pleadings. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972). Upon closer examination, it is obvious that petitioner attempts to make the same arguments that were offered by his public defender in his state court appellate brief. Taking this into consideration, we assume for the sake of this petition that petitioner's arguments coincide with those set forth in his state court appellate brief.

That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

*Id.* at 302, 93 S.Ct. at 1049. In assessing the reliability of the hearsay testimony, the Court pointed to four factors which provided "persuasive assurances of trustworthiness": (1) the confession was spontaneously made to two close acquaintances shortly after the murder occurred; (2) each statement was corroborated at trial by other independent evidence; (3) the confession was self-incriminating and unquestionably against penal interest; and (4) the declarant was available for cross examination at trial. *Id.* at 300–01, 93 S.Ct. at 1048–49. Other courts have held that "the factors just mentioned in the decision assessing reliability of hearsay testimony should not be considered exhaustive or absolute." *Sharlow v. Israel,* 767 F.2d 373, 377 (1985); *see also Rivera v. Director, Dept. of Corrections,* 915 F.2d 280, 282 (1990); *People v. Bowel,* 111 Ill.2d 58, 94 Ill.Dec. 748, 753, 488 N.E.2d 995, 1000 (1986).

Courts applying the *Chambers* rule have stated that "when the hearsay rule, combined with other doctrines and circumstances, conspires to deprive the accused of a fundamentally fair trial, the legal rule yields." *Cunningham v. Peters,* 941 F.2d 535, 539 (7th Cir.1991). Our task is thus to evaluate the significance and reliability of relevant exculpatory evidence and then balance it against the competing state interest in the procedural rule that prevented the defendant from presenting this evidence at trial. *Id.* at 538; *see also Sharlow,* 767 F.2d at 377. Only excluded evidence deemed "critical" to the defendant will be considered. *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049; *see also United States v. Valenzuela–Bernal,* 458 U.S. 858, 868, 102 S.Ct. 3440, 3446–47, 73 L.Ed.2d 1193

(1982) (stating that excluded evidence must be relevant, material and vital to the defendants to a degree sufficient to establish that the exclusion of the evidence could have affected the outcome of the trial).

Federal Rule of Evidence 804(b)(3), enacted after *Chambers,* provides a statement against interest exception to the hearsay rule.[4] Although federal rule does not control this case, courts applying the rule have evaluated corroborating factors indicating trustworthiness clearly relevant in determining the reliability of out-of-court statements sought to be admitted under *Chambers. See United States v. Garcia,* 897 F.2d 1413, 1420–21 (7th Cir.1990); *United States v. Silverstein,* 732 F.2d 1338, 1346–47 (7th Cir. 1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). Because of these intersecting analyses we will look to cases applying Rule 804(b)(3) in assessing the reasonableness of the state court's exclusion of Ryan Gooch's confession.

In this case the state appellate court found that the indicia of reliability suggested in *Chambers* were lacking. *Gooch,* No. 3–92–0626, at 11. Specifically, the court found (1) Ryan's confession was not made spontaneously to a close acquaintance shortly after the crime since the confession was made while in police custody; (2) Ryan's confession was not corroborated by other evidence; and (3) Ryan was unavailable for cross examination at trial since his attorney indicated that if called to testify Ryan would refuse upon Fifth Amendment grounds. *Id.* We find that the state court's application of the *Chambers* factors in excluding Ryan Gooch's confession was "unreasonable" under 28 U.S.C. § 2254(d)(1) and thus requires that we grant petitioner's request for habeas corpus relief.

■ The first question for us under *Chambers* is whether Ryan Gooch's confession was made spontaneously shortly after the offense. Eskridge was shot at approxi-

---

4. Rule 804(b)(3) provides in relevant part as follows:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: (3) A statement which ... so far tended to subject the declarant to civil or criminal liability ... that a

reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

mately midnight on December 26. Ryan's father brought him to the station in the early morning hours of December 27, when he learned that Ryan was wanted for questioning. Ryan was arrested, and then questioned by Detective Stein, in the presence of his father. Detective Stein informed Ryan that the police were accusing petitioner and wanted Ryan to confirm their account of the events. At that point Ryan told the detective that he shot Eskridge. After Ryan confessed, the petitioner was brought into the room and Ryan repeated his confession in front of petitioner. As these facts indicate, Ryan made his confession to the police without prompting, in front of his father, during the early morning hours following the shooting.

The state court found that Ryan's confession lacked the requisite spontaneity since it was made in response to police questioning in a custodial atmosphere. However, we believe that the state court inappropriately applied *Chambers* and its progeny in making this finding. To begin with, Ryan's confession was not made under the duress of a police interrogation designed to elicit an incriminating response. To the contrary, the confession was made after Detective Stein told Ryan that he believed petitioner was the shooter and Ryan merely a witness, which would have substantially defused any feelings of compulsion.[5]

More significantly, it is well-established that a confession made to the police is a strong indicator of its reliability. *Cunningham*, 941 F.2d at 540; *Rivera*, 915 F.2d at 282. The *Chambers* factors are designed to determine when the reliability of a declarant's statement is tainted by motive to fabricate. The Seventh Circuit has stated that a

confession to the police is unlikely to be fabricated since the "specter of prosecution" would be obvious. *Cunningham*, 941 F.2d at 540. Exceptions to this presumptive reliability of police confessions exist where it is appears that the declarant's confession has been coerced or was deliberately made to shift blame from the defendant. *See Rivera*, 915 F.2d at 282. A confession to the police is also deemed of dubious reliability where it was apparently made to curry favor with the authorities. *See Garcia*, 897 F.2d at 1421 (holding that the confession of a co-conspirator made during a custodial interrogation was admissible under Rule 804(b)(3), where there was no evidence that the statement was made to curry favor with the interrogators); *see also Earnest v. Dorsey*, 87 F.3d 1123 (10th Cir.1996) (finding co-defendant's custodial confession was sufficiently reliable to withstand confrontation clause challenge to its admissibility), *cert. denied*, —— U.S. ——, 117 S.Ct. 527, 136 L.Ed.2d 414 (1996). However, there is no basis to find that these exceptions apply to this case.

Ryan had no motive to shift the blame from petitioner. Although the state argued in its motion *in limine* that Ryan confessed because as a juvenile he would be treated more leniently than petitioner, this argument is undermined by the plain fact that Ryan would have been tried as an adult for first degree murder. Ill.Rev.Stat.1991, ch. 38, § 805–4(6)(a) (1991).[6] Further, this is not a case where a declarant who is already charged with a crime makes a statement that exculpates the defendant. *See Cunningham*, 941 F.2d at 540. To the contrary, Ryan made an inculpatory statement after being explicitly told that he was not the murder suspect. There is also no evidence that Ryan confessed to curry favor with authorities.

---

5. The state argues that the trustworthiness of Ryan's statement is diminished by the fact that "there is no indication that Ryan Gooch had given the statement after being advised of his *Miranda* rights." (Answer, at 12). We note that this argument conflicts with the argument the state made during trial. (R. at 238). Further, as discussed *supra*, we fail to see why Ryan's failure to be *Mirandized* matters given the presumptive reliability of police confessions and the fact that there is no evidence that his confession was made to shift blame or curry favor with the authorities.

6. The text of § 805–4(6)(a) reads in relevant part as follows:

> The definition of a delinquent minor under Section 5–3 of this Act shall not apply to any minor who at the time of an offense was at least 15 years of age and who is charged with first degree murder.... These charges and all other charges arising out of the same incident shall be prosecuted pursuant to the Criminal Code of 1961, as amended.

Ill.Rev.Stat.1991, ch. 38, § 805–4(6)(a) (1991).

Instead, Ryan offered his admission of guilt under circumstances where he had absolutely nothing to gain and everything to lose. We thus find that Ryan's confession to the police was reliable since the incentive to fabricate was extremely low.

Further, other circumstances exist which further support a finding that the statement satisfied the spontaneity prong of *Chambers.* In *Chambers,* the Court found that the declarant's statement made to a close friend on the morning after the crime should have been admitted despite its hearsay status. 410 U.S. at 293, 300, 93 S.Ct. at 1044–45, 1048. The timing of Ryan's confession in this case is similar to the declarant in *Chambers* and therefore meets the requirement that the statement be made shortly after the offense. The fact that Ryan confessed in the presence of his father, who is clearly more than a "close acquaintance," also weighs heavily in favor of the statement's reliability. *See e.g., People v. Ireland,* 38 Ill.App.3d 616, 348 N.E.2d 277, 281 (1976) (holding that declarant's confession of marijuana possession to her husband's parents within hours after her husband was arrested for the crime was an admissible statement against interest). Therefore, we find that the state court erroneously applied *Chambers* when it held that Ryan's statement was not ·spontaneously made shortly after the crime.

■ The next question under the *Chambers* test is whether Ryan Gooch's confession was corroborated by some other evidence in the case. The state appellate court found that Ryan's statement was not corroborated by other evidence and was in fact contradicted by the testimony of two witnesses, Susanna Marrs and Eugene Unger, who both identified petitioner as the shooter. *Gooch,* No. 3–92–0626, at 11. In its brief the state adds that Ryan and petitioner's relationship as cousins weighs heavily against the reliability of Ryan's statement.

We find that the state court imposed a standard of corroboration that was inconsistent with *Chambers.* The Court in *Chambers* only required that the confessions at issue were corroborated by *some* other evidence in the case. 410 U.S. at 300, 93 S.Ct. at 1048. *See also Garcia,* 897 F.2d at 1421.

Courts have held that under Rule 804(b)(3) the corroborative evidence must be "clear," meaning that the circumstances must solidly indicate trustworthiness. *Silverstein,* 732 F.2d at 1347 (quoting *United States v. Barrett,* 539 F.2d 244, 253 (1st Cir.1976)). The statement itself does not have to be "clearly corroborated" by evidence; rather, the circumstances must clearly indicate the reliability of the statements. *United States v. Garcia,* 986 F.2d 1135, 1141 (7th Cir.1993). Ryan Gooch's confession was supported by corroborating evidence indicating its trustworthiness. His statement of the events was consistent on all points with the eyewitness testimony of Susanna Marrs and Eugene Unger, except, of course, that Ryan's account contradicted their identification of petitioner as the shooter. It is arguable that the similarity between Ryan's version of the events leading up to the shooting and the other eyewitness accounts does no more than merely place Ryan at the scene. However, we think that there are critical pieces of evidence that sufficiently buttress Ryan's statement to meet the standard of corroboration articulated in *Chambers.*

Most significantly, Ryan confessed that he used a .22 caliber revolver to shoot Eskridge. This was corroborated by the recovery of a .22 caliber slug from Eskridge's body. Ryan also told the police that he hid the gun after he shot the victim, a point confirmed when Ryan led the police to Euron Matthew's house and showed the police where a .22 caliber weapon was hidden. This evidence in particular appears to corroborate Ryan's confession since it demonstrates Ryan's knowledge of the location of the putative murder weapon, knowledge that arguably would have been specific to the murderer. *See Earnest,* 87 F.3d at 1132 (stating that declarant's description of where murder weapon was hidden was corroborating evidence which supported statement's reliability); *Silverstein,* 732 F.2d at 1347 (stating that evidence that was merely consistent with declarant's statement was not clearly corroborative since it did not show that statement contained facts only the murderer would know). Moreover, there is reason to question the contradictory evidence offered by Marrs and Unger. Both

witnesses initially stated that petitioner's brother, Anthony, was the shooter, only later positively identifying petitioner as the guilty party. Both witnesses admitted that petitioner and his cousin were standing on the ground floor, side-by-side in the dark, while they were upstairs in Marrs' apartment. Neither witness saw petitioner pull out the gun, although Marrs testified that she saw petitioner raise his arm, and then a flash when the gun was fired. Further, both the petitioner and Ryan were wearing long black coats petitioner had on a black Raiders Starter jacket that came to his knees, while Ryan had on a black trench coat. Unger testified that the shooter was wearing a "long trench coat like." Finally, when Marrs and Unger were asked to identify the shooter at the crime scene, they were only offered petitioner and his brother Anthony as possible choices. Ryan was not presented as an option. We find that Ryan's unique knowledge of the type and location of the murder weapon, combined with the witness accounts that the shot was fired in the dark by someone wearing a long black coat from the ground floor constitutes evidence which meets the *Chambers* corroboration requirement.

■ The state court seemed to mistakenly assume that if any evidence inconsistent with the confession existed, then there was no corroboration under *Chambers*. That is not the correct test. That formulation inverts the evidentiary burden by requiring the defendant at trial to absolutely corroborate the declarant's entire statement, instead of merely requiring the defendant to show some evidence in support of the allegations contained in the confession. *See Barrett*, 539 F.2d at 253 (finding that the corroboration requirement in Federal Rule 804(b)(3) did not impose a standard so strict as to be "utterly unrealistic," but instead required evidence beyond "minimal corroboration," which solidly indicated trustworthiness); *see also Commonwealth v. Drew*, 397 Mass. 65, 489 N.E.2d 1233, 1241 (1986). The corroboration requirement under Rule 804(b)(3) has been held to be a "preliminary question as to the admissibility of evidence, not an ultimate determination as to the weight to be given such evidence." *Garcia*, 986 F.2d at 1141. The judge "does not need to be completely

convinced that exculpatory statements are true prior to their admission." *Id.* The fact that there were eyewitnesses who contradicted Ryan's account of events does not mean Ryan's confession was uncorroborated; rather, the existence of contradictory witnesses merely demonstrates a factual conflict that must ultimately be resolved by the trier of fact. *See Rivera*, 915 F.2d at 282 (stating that it begs the question of reliability to assume that one witness' version of events is correct and that any contrary evidence is thus unreliable).

The state also argues that the family relationship between Ryan and petitioner weighs against the trustworthiness of Ryan's confession. In support of this proposition, the state cites *United States v. Silverstein*, 732 F.2d at 1338. In *Silverstein*, the court found that there were no corroborating circumstances warranting the admission of a confession by a prison inmate that he killed another prisoner. *Id.* at 1347. The court emphasized that Rule 804(b)(3) was not designed to allow the admission of statements where it appeared that the declarant confessed merely to shield his "pal" from blame. *Id.* at 1346. However, petitioner's case is clearly distinguishable from *Silverstein*. In *Silverstein*, the declarant was already serving time in a maximum security federal prison and the court acknowledged that even if he had been convicted of the confessed murder the government could not have imposed a sentence upon him which significantly exceeded the one he already was serving. *Id.* Thus, the declarant could make his confession without fear of real punishment. That is extremely different from petitioner's case since Ryan's confession would have subjected him to a first degree murder prosecution. While the relationship between petitioner and Ryan may give rise to suspicions regarding its trustworthiness, we do not think that their relationship necessarily undermines the reliability of Ryan's statement, especially in light of the severe punishment Ryan subjected himself to by making his confession.

Since it is undisputed that Ryan's confession was against penal interest, the third *Chambers* factor is satisfied. A statement is against penal interest if it "tended to sub-

ject" the declarant to criminal liability so that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. *Garcia,* 897 F.2d at 1420. A statement satisfies this requirement if it would be probative in trial against the defendant. *Id.* Clearly, Ryan's statement that he was the shooter "tended to subject" him to criminal liability in that, if accepted as true, it would have made him the primary defendant in a homicide prosecution where he could have been tried as an adult. This is not a position that a reasonable person would assume without a strong belief in the truthfulness of his confession.

■ Finally, we find that the state appellate court improperly applied the fourth *Chambers* factor by making Ryan's unavailability at trial a "significant" factor in its decision upholding the exclusion of his confession. The *Chambers* factors should not be considered exhaustive or absolute in determining the reliability of out-of-court statements. *Sharlow,* 767 F.2d at 377. In particular, courts have not held the unavailability of the declarant to be the *sine qua non* of a confession's admissibility. *See Green v. Georgia,* 442 U.S. 95, 96, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979) *(per curiam )* (making no mention of the availability of declarant in holding that a state court's exclusion of a confession during the sentencing phase of the trial violated the defendant's due process rights ); *Cunningham,* 941 F.2d at 541. *Rivera v. Director, Dept. of Corrections,* 915 F.2d at 280, is on point in this regard. In *Rivera,* the defendant had been convicted of beating a woman to death. *Id.* at 281. A co-defendant confessed that he alone committed the murder and was convicted on the basis of his confession. *Id.* When Rivera attempted to introduce the co-defendant's confession at his own trial as exculpatory evidence, the trial court refused on the ground that under Illinois law the availability of the declarant for cross examination was the most important factor in the admission of hearsay evidence. *Id.* The Seventh Circuit reversed the district court's denial of habeas corpus, holding that the state had mechanically applied the hearsay rule to exclude critical evidence in violation of Chambers. *Id.* at 283. The court held that the unavailability of the co-defendant could not bar admission of his confession at Rivera's trial, especially since the co-defendant's refusal to testify at his own trial did not preclude the admission of the confession against him. *Id.* at 282. Similarly, the fact that Ryan was unavailable for cross examination here does not preclude the admission of his confession where the other *Chambers* factors indicating reliability have been met. A declarant's refusal to answer questions should not result in the conviction of a man who is not guilty. *Ireland,* 348 N.E.2d at 282. We think that this analysis is not only consistent with the case law, but also in line with the underlying purpose of recognizing an exception to the hearsay rule, which is to permit the admission of statements which carry sufficient indicators of reliability to render the presence of the declarant unnecessary. *See* Fed.R.Evid. 804(b)(3); *Garcia,* 897 F.2d at 1420 (stating that the against-penal-interest exception to the hearsay rule under 804(b)(3) is satisfied only when the declarant is unavailable).

■ It is true, as the state points out, that the federal interest in habeas review "lies in ensuring that states conduct their criminal process in a way likely to separate the guilty from the innocent, not in second-guessing every evidentiary ruling." *Lee v. McCaughtry,* 933 F.2d 536, 538 (7th Cir.1991), *cert. denied,* 502 U.S. 895, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991). We acknowledge that Illinois state courts have conformed their hearsay rules to *Chambers, see Bowel,* 94 Ill.Dec. 748, 488 N.E.2d at 999, which militates against a case-by-case federal "rerun" of state court rulings. *Lee,* 933 F.2d at 538. But it is also true that a state court cannot apply the *Chambers* factors in a way that unreasonably excludes reliable exculpatory evidence which is critical in determining the guilt of the accused. *Chambers* would have diminished constitutional force if state courts could simply avoid federal review of their decisions to exclude third party confessions by reciting the *Chambers* factors and then concluding that they do not support admission of the out-of-court statement. Under 28 U.S.C. § 2254(d)(1) we are bound to evaluate the reasonableness of a state court's applica-

tion of federal law. In this case, where the circumstances surrounding Ryan Gooch's confession supported its reliability, the state court unreasonably applied *Chambers* and, in so doing, deprived the defendant of his right to a fair trial.[7]

### CONCLUSION

For the foregoing reasons petitioner's motion is granted. The petitioner shall be released unless the state retries him within 120 days.

---

7. Because we hold that petitioner's habeas petition should be granted because the state court unreasonably applied *Chambers v. Mississippi* in excluding Ryan Gooch's confession at petitioner's trial, we need not address his other claims for relief.